IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-803

Filed: 16 May 2017

Catawba County, No. 15 CVS 1286

RICHARD C. WILSON, Plaintiff,

v.

PERSHING, LLC; BANK OF NEW YORK MELLON CORPORATION; JBS LIBERTY SECURITIES, INC.; THE PNC FINANCIAL SERVICES GROUP, INC.; SYNERGY INVESTMENT GROUP, LLC; JBS GROUP, LLC; RBC CAPITAL MARKETS CORPORATION; and JOHN DOE 1, Defendants.

Appeal by plaintiff from order entered 17 December 2015 by Judge Timothy S. Kincaid in Catawba County Superior Court. Heard in the Court of Appeals 7 March 2017.

Law Offices of Matthew K. Rogers, PLLC, by Matthew K. Rogers, for plaintiff-appellant.

McGuireWoods, LLP, Charlotte, by Brian P. Troutman, Wm. Grayson Lambert, and Anita Foss, for defendants-appellees Pershing, LLC and Bank of New York Mellon Corporation.

Jones Law Firm, by Jeffrey D. Jones, for defendants-appellees JBS Liberty Securities, Inc. and Synergy Investment Group, LLC.

Poyner Spruill LLP, Charlotte, by Thomas L. Ogburn III and John M. Durnovich, for defendant-appellee The PNC Financial Services Group, Inc.

Womble Carlyle Sandridge & Rice, LLP, by W. Clark Goodman, for defendant-appellee RBC Capital Markets Corporation.

ZACHARY, Judge.

Plaintiff Richard C. Wilson appeals from an order dismissing his civil claims against Pershing, LLC (Pershing), Bank of New York Mellon (BNY Mellon), JBS Liberty Securities, Inc. (JBS Liberty), Synergy Investment Group, LLC (Synergy), JBS Group, LLC (JBS Group), RBC Capital Markets Corporation (RBCCMC), and John Doe I (collectively, defendants) pursuant to Rules 12(b)(1), (4), and (6) of the North Carolina Rules of Civil Procedure. For the reasons that follow, we affirm the trial court's order in its entirety.

## I. Background

Wilson is the founder of Ipswich Bay, LLC (Ipswich), a real estate development company. In 1996, Wilson sought to purchase and develop 112 acres of real property located on Lake Norman. This development project was entitled "Harbor Cove." After Wilson obtained a revolving line of credit from Centura Bank (the Centura Loan) to finance the Harbor Cove project, he engaged a tax attorney to provide tax treatment and planning advice related to the Centura Loan. Working with Centura, Wilson's legal team determined that Wilson could obtain certain tax advantages if funds to be used as security for the Centura Loan were held in a trust account.

According to Wilson, on 28 February 1996, Centura Bank Vice President Greg Grier stated that $250,000.00 could be deposited into a trust account at Centura Bank, and that the funds would serve as collateral for the Centura Loan as well as other potential loans. These funds were subsequently invested in mutual fund

investment accounts (the Ipswich Security Account) that were managed by either Centura Bank or Centura Securities, Inc. (Centura Securities). As part of Wilson's tax strategy, the funds in the Ipswich Security Account were held for his benefit, but not in his name. It appears that Chris Teague, a Centura employee, was responsible for managing the Ipswich Security Account. Wilson understood that the $250,000.00 deposit would remain invested in mutual funds until he requested that the money be returned to him, that he would benefit from mutual fund appreciation, and that no taxes would be levied on funds in the Ipswich Security Account or on any gains accruing while those monies were held in trust.

It is not clear how long the Harbor Cove project lasted, but Wilson alleges that he "continued to sell property in Harbor Cove through and after 2006." Wilson also alleges that while he met with his accountant, attorneys, and bankers concerning the Harbor Cove project "on a quarterly basis for many years[,]" none of Wilson's "trusted advisors" ever indicated that the funds from the Ipswich Security Account needed to be transferred or liquidated. In 2013, Wilson met with his accountant to discuss potential tax write-offs related to Ipswich's developments at Lake Norman. While gathering information concerning Ipswich's depreciation schedules reaching back to 1985, Wilson "discovered Ipswich's detailed documentary records that had been kept in storage for [him]." Wilson found within the Ipswich files a certified check issued by Centura Securities in the amount of $250,000.00. The check, dated 23 October

1998, was made payable to "Richard Gregg Wilson"[1] and stated on its face that it was "void after 180 days." In addition, the check displayed references to defendant BNY Mellon and defendant Pershing, a wholly owned subsidiary of BNY Mellon. Wilson later learned that Pershing was a service provider on the Ipswich Security Account.

Wilson contacted PNC Bank, N.A. (PNC)—an entity that Wilson believed was the successor in interest to Centura Securities—in late 2013 regarding the check, and PNC indicated that it would research the matter. While his inquiry was pending with PNC, Wilson presented the check to Wells Fargo, N.A., which refused to honor it and referred Wilson to the check's maker. By letter dated 15 January 2014, PNC informed Wilson that "[a]lthough the assets in the account with Centura Securities, Inc. [(i.e., the Ipswich Securities Account)] secured a loan made by Centura Bank, Centura Bank never had possession of the funds or the account other than its security interest." The letter further stated that PNC never acquired any portion of Centura Securities; rather, Centura Securities became RBC Centura Securities, an entity that sold some of its assets to RBC Dain Rausher, which was later acquired by defendants Synergy and JBS Group in 2007. After Wilson filed a complaint with the U.S. Consumer Financial Protection Bureau, PNC reiterated that it never acquired any

---

[1] On appeal, Wilson maintains that his name is "Richard Craig Wilson." However, a copy of Wilson's drivers' license contained in the record appears to list Wilson's middle name as "Gregg" or "Cregg."

part of Centura Securities, and that Wilson's claim had to be directed to Synergy or JBS.

Wilson eventually retained legal counsel, who presented the check to and demanded payment from BNY Mellon in August 2014. Pershing's general counsel, Jane Myers, responded to this demand by letter dated 10 September 2014. Myers explained that Pershing acted as a "clearing" firm for the investment account managed by Centura Securities. In this capacity, Pershing was limited to providing "custodial, execution[,] and clearance services" for the Ipswich Security Account. Myers also rejected Wilson's demand for payment on the check as follows:

> [T]he check here was not a "certified casher's" check as you claim, but was drawn against the assets held in the Account. On its face, the check stated that is was "void after 180 days" when it was issued 15 years ago. . . .
>
> Because the age of the check exceeds the record retention period, [Pershing has] very limited information about the check and the Account. However, [Pershing's] records reflect that the check was stopped on or about October 26, 1998. The Account was subsequently closed in July 1999.[2] Accordingly, there are no funds on deposit with Pershing and/or BNY Mellon purportedly owed to [Wilson] on the check. [Pershing] must direct you to the drawer of the check for any amounts allegedly owed.

Unable to negotiate the check or otherwise locate the Ipswich Security Account

---

[2] Before Wilson's demand for payment on the check was refused, Wilson's attorney had spoken with David Butler, an attorney in Pershing's legal department. Wilson alleges that Butler "refused to tell [Wilson's counsel] who directed that the Ipswich Security Account be closed[,]" and that "Butler represented he was not able to discern or disclose to whom the money in the Ipswich Security Account was distributed."

funds, Wilson filed a verified complaint (original complaint) in Catawba County Superior Court against Pershing, BNY Mellon, Synergy, JBS Liberty, JBS Group, RBCCMC, and John Doe I. The original complaint, filed 22 May 2015, alleged claims for breach of fiduciary duty, constructive fraud, unjust enrichment, breach of contract, fraud, and unfair and deceptive trade practices. Defendants all filed motions to dismiss Wilson's original complaint. On 2 November 2015, the Honorable Timothy Kincaid conducted a hearing on defendants' motions to dismiss.

Shortly before Judge Kincaid called the case for hearing, Wilson's attorney filed an amended complaint and served it on defendants' attorneys. The amended complaint contained some new allegations and added a claim for civil conspiracy,[3] but it generally mirrored the original complaint. Once the case came on for hearing, Wilson's attorney argued that the filing of the amended complaint rendered moot defendants' motions to dismiss, which were directed at the original complaint. Wilson's attorney then asserted that the trial court should not proceed with the hearing, and that the parties should be granted time to brief issues raised by the amended complaint. Defense counsel, however, advised the court that they were prepared to proceed as scheduled. Judge Kincaid refused to continue the hearing, reserved his ruling on Wilson's motion to amend, and proclaimed as follows:

> [I]f I'm able to determine that [Wilson's] amended
> complaint can be filed as a matter of right, and would make

---

[3] More specifically, the new claim alleged that "[o]ne or more of the [d]efendants conspired" to commit a breach of fiduciary duty, constructive fraud, and fraud.

> any ruling that I make moot, then that's what I'll do. But I can't make a ruling on whether or not to hear the thing until I hear the thing. So . . . that's what I'm going to do.

As the hearing went forward, both parties referenced the original complaint and the amended complaint in their arguments to the court. Toward the end of the hearing, Judge Kincaid announced that he would dismiss all claims against defendants, and explained that his ruling applied to the original complaint. Defendants then sought clarification as to whether Judge Kincaid's ruling extended to the amended complaint. Acknowledging that he "had not determined whether or not it ha[d] been filed as a matter of right[,]" Judge Kincaid stated that because it was "clear argument was referenced to the amended complaint[,] I'm going to consider that as a waiver of any objection [by defendants] to amend, allow the amendment, and then grant the motions [to dismiss] that I just granted on the original the same as to the amended." Judge Kincaid also concluded that Wilson had waived any objection to the trial court's decision to proceed with the hearing and to rule on the defendants' oral motions to dismiss the amended complaint.

On 17 December 2015, Judge Kincaid entered a written order that memorialized his oral rulings at the 2 November 2015 hearing. Judge Kincaid concluded that all of Wilson's claims should be dismissed pursuant to Rule 12(b)(6) because they were time-barred by the applicable statutes of limitations. The written order also contained additional reasons as to why Wilson's claims against individual

defendants were dismissed.

The claims against Pershing, BNY Mellon, PNC, and RBCCMC were dismissed by the court pursuant to Rule 12(b)(1) of the North Carolina Rules of Civil Procedure for lack of standing. Judge Kincaid further ruled that dismissal was proper under Rule 12(b)(6) because Wilson failed to allege the existence of a contractual and a fiduciary relationship between either BNY Mellon or RBCCMC[4] and Wilson, and that Wilson failed to plead any alleged fraudulent acts by BNY Mellon and RBCCMC with particularity, as required by Rule 9(b) of the North Carolina Rules of Civil Procedure. The fraud claims against Synergy and JBS Liberty were also dismissed because they failed to satisfy Rule 9(b)'s particularity requirements. Wilson appeals from the order dismissing his claims against defendants.

## II. Discussion

A. <u>Trial Court's Refusal to Continue the 2 November 2015 Hearing</u>

We first address Wilson's assertion that Judge Kincaid improperly proceeded with the hearing on defendants' motions to dismiss. A trial court's ruling on a motion to continue is reviewed for abused of discretion. *Morin v. Sharp*, 144 N.C. App. 369, 373, 549 S.E.2d 871, 873 (2001) (citation omitted). "[T]here is power inherent in every court to control the disposition of causes on its docket with economy of time and effort

---

[4] The claims against RBCCMC were also dismissed pursuant to Rule 12(b)(4) of the North Carolina Rules of Civil Procedure for insufficient service of process.

for itself, for counsel, and for litigants." *Watters v. Parrish*, 252 N.C. 787, 791, 115 S.E.2d 1, 4 (1960).

Initially we note that defense counsel has brought to the Court's attention the fact that Wilson's brief violates Rule 28(b)(6) of the Rules of Appellate Procedure because it does not contain a concise statement of the applicable standard of review for this issue. The Appellate Rules are mandatory, and failure to comply with them subjects an appeal or issue to dismissal. *State v. Hart*, 361 N.C. 309, 311, 644 S.E.2d 201, 202 (2007). However, our Supreme Court has held that failure to comply with a nonjurisdictional rule, such as Rule 28(b)(6), "normally should not lead to dismissal[,]" *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 198, 657 S.E.2d 361, 365 (2008), though some other sanction pursuant to Rules 25(b) or 34 may be appropriate. *Hart*, 361 N.C. at 311, 644 S.E.2d at 202. In this instance, we elect not to take any action.

Wilson argues that his motion to continue the hearing should have been granted because the filing of his amended complaint—which occurred minutes before the hearing—rendered defendants' motions to dismiss the original complaint moot. However, Wilson's argument ignores defendants' oral motions to dismiss the amended complaint, and Wilson does not challenge on appeal the trial court's consideration of those motions.

It is true that defendants' motions to dismiss the original complaint eventually became moot. However, this did not occur until the trial court *allowed* Wilson to amend the original complaint at the end of the hearing. *See Houston v. Tillman*, 234 N.C. App. 691, 695, 760 S.E.2d 18, 20 (2014) (holding that the "plaintiff's amendment and restatement of the complaint[,]" which was accepted by the trial court, "rendered any argument [by the defendants] regarding [their motions to dismiss] the original complaint moot"). As the hearing unfolded, defendants and Wilson referenced the amended complaint while making their arguments. Although Judge Kincaid initially granted the defendants' motions to dismiss the original complaint, shortly thereafter, he granted Wilson's motion to amend, concluding that defendants had waived any objection to the amendment. Judge Kincaid then dismissed the amended complaint upon the same grounds that warranted dismissal of the original complaint.

The gravamen of Wilson's contention is that he was prejudiced by Judge Kincaid's decisions to hear arguments on the original complaint, dismiss the original complaint in its entirety, and then extend that ruling to the amended complaint. However, we need not decide this issue. Although Wilson's counsel argued that the court should not proceed with the hearing, Judge Kincaid's conclusion that Wilson waived "any objection to the [trial court's] consideration of the Motion to Dismiss with respect to the Amended Complaint" has not been challenged on appeal.

Consequently, we deem this issue abandoned pursuant to Rule 28(b)(6) of the Rules of Appellate Procedure.

B. Scope of Appeal

Because the "Issues Presented" section of Wilson's principal brief purports to raise thirteen issues on appeal, we must first determine whether all of those issues are properly before us. One point of considerable dispute is whether Wilson has preserved for appellate review the trial court's dismissal of his claims against Pershing, BNY Mellon, PNC, and RBCCMC for lack of standing.

Standing, which is properly challenged by a Rule 12(b)(1) motion to dismiss, *Fuller v. Easley*, 145 N.C. App. 391, 395, 553 S.E.2d 43, 46 (2001), "is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Aubin v. Susi*, 149 N.C. App. 320, 324, 560 S.E.2d 875, 878 (2002). "If a party does not have standing to bring a claim, a court has no subject matter jurisdiction to hear the claim." *Estate of Apple v. Commercial Courier Express Inc.*, 168 N.C. App. 175, 177, 607 S.E.2d 14, 16 (2005).

Wilson argues in his reply brief that the "Issues Presented, Statement of the Case, relevant parts of the Statement of Facts, and Argument Section F [(Wilson's challenge to the trial court's decision to proceed with the 2 November 2015 hearing)] clearly challenge (and defeat) [the] erroneous assertion that [the standing] arguments were abandoned." Wilson's position is inherently flawed for the following reasons.

To begin, the issues presented, statement of the case, and statement of the facts sections of an appellant's brief cannot substitute for substantive *arguments* on an issue. *See* N.C. R. App. P. 28(b)(6) (requiring that a principal brief "contain the *contentions* of the appellant with respect to each issue presented" and providing that "[i]ssues not presented in a party's brief, or in support of which *no reason or argument* is stated, will be taken as abandoned") (emphasis added). As Wilson's principal brief does not contain any substantive arguments on standing, this issue has been abandoned. *Id.* Wilson's reply brief cannot be used to correct this deficiency in his principal brief. *Larsen v. Black Diamond French Truffles, Inc.*, __ N.C. App. __, __, 772 S.E.2d 93, 96 (2015) (a party's reply brief could not correct the omission of a statement of the grounds for appellate review in the party's principal brief); *Beckles-Palomares v. Logan*, 202 N.C. App. 235, 246, 688 S.E.2d 758, 765 (2010) (the defendant's contention that the plaintiff's claim was barred by the applicable statute of repose was abandoned and the issue could not be revived via reply brief). In addition, no portion of Wilson's argument concerning the 2 November 2015 hearing challenges the trial court's dismissal on the basis of lack of standing. Because any argument on the standing issue has been abandoned, the trial court's dismissal of all of Wilson's claims against Pershing, BNY Mellon, PNC, and RBCCMC under Rule 12(b)(1) remains undisturbed.

As a result, the only issues remaining on appeal are those related to the trial court's dismissal of Wilson's claims against Synergy and JBS Liberty. Wilson does not assert that his claims for unjust enrichment, breach of contract, unfair and deceptive trade practices, and civil conspiracy against Synergy and JBS Liberty were improperly dismissed. Any argument that those claims were erroneously dismissed is abandoned, N.C. R. App. P. 28(b)(6), and the trial court's unchallenged dismissal of those claims remains undisturbed. A careful review of Wilson's principal brief, however, reveals that he does specifically challenge the trial court's Rule 12(b)(6) dismissal of his claims against Synergy and JBS Liberty for breach of fiduciary duty, constructive fraud, and fraud. Consequently, our review is limited to whether the trial court erred in dismissing any or all of these three claims, as alleged against Synergy and JBS Liberty.

C. Standard of Review under Rule 12(b)(6)

Rule 12(b)(6) provides for the dismissal of an action when the complaint "fail[s] to state a claim upon which relief can be granted." N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) (2015). Our review of an order granting a Rule 12(b)(6) motion has several aspects. We consider "whether the allegations of the complaint . . . are sufficient to state a claim upon which relief can be granted under some legal theory." *Coley v. State*, 360 N.C. 493, 494-95, 631 S.E.2d 121, 123 (2006) (citation and internal quotation marks omitted). Under this mode of review, "the well-pleaded material

allegations of the complaint are taken as true[,]" *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970) (citation omitted), and "the complaint is liberally construed[.]" *Wells Fargo Bank, N.A. v. Corneal*, 238 N.C. App. 192, 195, 767 S.E.2d 374, 377 (2014). Legal conclusions, however, are not entitled to a presumption of validity." *Id.* Similarly, this Court is "not required . . . to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Strickland v. Hedrick*, 194 N.C. App. 1, 20, 669 S.E.2d 61, 73 (2008) (citations and internal quotation marks omitted). In sum, this Court "must conduct a *de novo* review of the pleadings to determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct." *Craven v. Cope*, 188 N.C. App. 814, 816, 656 S.E.2d 729, 732 (2008) (citation omitted).

D. Statutes of Limitations

Judge Kincaid dismissed all of Wilson's claims on the basis that they were time-barred by the applicable statutes of limitations. As explained above, however, the dismissal of Wilson's claims for breach of fiduciary duty, fraud, and constructive fraud against Synergy and JBS Liberty are the only issues that remain subject to appellate review.

A Rule 12(b)(6) motion to dismiss is the proper vehicle for asserting " '[a] statute of limitations defense . . . if it appears on the face of the complaint that such a statute bars the claim. Once the defendant raises a statute of limitations defense,

the burden of showing that the action was instituted within the prescribed period is on the plaintiff.' " *Birtha v. Stonemor, N. Carolina, LLC*, 220 N.C. App. 286, 292, 727 S.E.2d 1, 6-7 (2012) (quoting *Horton v. Carolina Medicorp*, 344 N.C. 133, 136, 472 S.E.2d 778, 780 (1996)).

Wilson makes a general argument that the relevant statutes of limitations did not begin to run until he discovered the uncashed check and unsuccessfully attempted to negotiate it. Wilson then makes the more specific argument that he has sufficiently "alleged his efforts supporting his diligence (including periodic meetings with his advisors), and that his trusted advisors' representations prevented Wilson from learning earlier in time that the Ipswich Security Account was closed." We disagree.

"Allegations of breach of fiduciary duty that do not rise to the level of constructive fraud are governed by the three-year statute of limitations applicable to contract actions contained in N.C. Gen. Stat. § 1-52(1) ([2015])." *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335, *disc. review denied*, 360 N.C. 78, 623 S.E.2d 263 (2005). In contrast, "[a] claim of constructive fraud based upon a breach of a fiduciary duty falls under the ten-year statute of limitations contained in N.C. Gen. Stat. § 1-56 ([2015])." *NationsBank of N. Carolina, N.A. v. Parker*, 140 N.C. App. 106, 113, 535 S.E.2d 597, 602 (2000). Claims for actual fraud are subject to a three-year statute of limitations. N.C. Gen. Stat. § 1-52(9) (2015).

In general, "[s]tatutes of limitation are . . . seen as running from the time of injury, or discovery of the injury in cases where that is difficult to detect. They serve to limit the time within which an action may be commenced after the cause of action has accrued." *Trustees of Rowan Tech. v. Hammond Assoc.*, 313 N.C. 230, 234 n.3, 328 S.E.2d 274, 276-77 n.3 (1985).

With respect to actual fraud claims, "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake." N.C. Gen. Stat. § 1-52(9) (2015). " '[D]iscovery' means either actual discovery or when the fraud should have been discovered in the exercise of reasonable diligence." *State Farm Fire & Cas. Co. v. Darsie*, 161 N.C. App. 542, 547, 589 S.E.2d 391, 396 (2003). The circumstances at issue dictate whether this determination falls within the province of the jury or the trial court. Whether a plaintiff exercised due diligence in discovering the fraud is ordinarily an issue of fact for the jury "when the evidence is not conclusive or is conflicting." *Huss v. Huss*, 31 N.C. App. 463, 468, 230 S.E.2d 159, 163 (1976). "Failure to exercise due diligence may be determined as a matter of law, however, where it is clear that there was both *capacity* and *opportunity* to discover the [fraud]." *Spears v. Moore*, 145 N.C. App. 706, 708-09, 551 S.E.2d 483, 485 (2001) (emphasis added) (citing *Huss*, 31 N.C. App. at 468, 230 S.E.2d at 163). Furthermore, "it is generally held that when it appears that by reason of the confidence reposed the confiding party is *actually deterred* from sooner suspecting or

discovering the fraud, he is under no duty to make inquiry until something occurs to excite his suspicions." *Vail v. Vail*, 233 N.C. 109, 116-17, 63 S.E.2d 202, 208 (1951) (emphasis added; citation and internal quotation marks omitted).

This Court has also applied the "due diligence" standard in determining when the statute of limitations begins to run on a claim for breach of fiduciary duty. *Dawn v. Dawn*, 122 N.C. App. 493, 495, 470 S.E.2d 341, 343 (1996) ("The statute begins to run when the claimant 'knew or, by due diligence, should have known of the facts constituting the basis for the claim.' ") (internal quotation marks omitted) (citing *Pittman* v. Barker, 117 N.C. App. 580, 591, 452 S.E.2d 326, 332, *review denied*, 340 N.C. 261, 456 S.E.2d 833 (1995)). We also find it appropriate to apply this standard to Wilson's constructive fraud claim. *See Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 485, 593 S.E.2d 595, 601 (2004) (applying the "reasonable diligence" standard applicable to actions grounded in fraud to determine whether the pertinent statutes of limitations barred the plaintiffs' claims for fraud, constructive fraud, negligent misrepresentation, and unfair and deceptive trades practices).

Here, the relevant events concerning the timing of the alleged fraudulent acts were as follows: Wilson deposited $250,000.00 in the Ipswich Security Account in 1996; the check was issued on 23 October 1998, and it became void in April 1999; and the Ipswich Security Account was closed in July 1999. The gravamen of Wilson's amended complaint is that the relevant fraudulent act occurred when the Ipswich

Security Account funds were "secretly" transferred in July 1999. Wilson inadvertently came across the check in 2013 after he "discovered [and searched] Ipswich's detailed documentary records that had been kept in storage for [him]." In pleading his claims for breach of fiduciary duty and constructive fraud, Wilson alleges that:

> 95. Despite meeting with his trusted advisors on regular basis until through at least 2005, at no point was Wilson notified or did Wilson receive a statement indicating that funds in the Ipswich Security Account were transferred or the Ipswich Security Account was closed.
> . . .
>
> 98. Wilson placed his confidence and trust in the Defendants and the Defendants acted in a manner that did not cause Wilson to become suspicious. This relationship of trust and confidence delayed Wilson's discovery of the fraud, and until Wilson's recent discovery of the check and refusal to honor the check or provide funds in the Ipswich Security Accounts, the refusal to provide Wilson with information regarding the Trust Account, and the "No Action Letter," the acts of one or more of the Defendants were only recently discovered and could not have been discovered with reasonable diligence, until recently.

Paragraph 127 of Wilson's fraud claim contains the allegation that "one or more of the Defendants intentionally failed to disclose [the transfer of the Ipswich Security Account funds in July 1999] to Wilson intending to fraudulently conceal knowledge of the transfer to Wilson."

Critically, despite the conclusory allegation at the end of paragraph 98, Wilson fails to allege how the exercise of due diligence would not have led Wilson to discover

that the funds had been transferred or withdrawn. Wilson had the capacity to investigate the Ipswich Security Account's status at any time, as the account was opened with *his* funds for *his* benefit, and the check was found in the "detailed documentary records" that had been kept for *him*. There is no allegation that Wilson was denied access to his own files. Wilson also had the opportunity to discover that the funds had been transferred simply by inquiring as to the account's status or balance. Significantly, Wilson alleges that his "trusted advisors" never notified him or furnished him with a statement indicating that the Ipswich Security Account had been closed. It is possible that Wilson's advisors were tasked with handling certain matters related to the Harbor Cove project, and that they made representations that lulled Wilson into a sense of security. But those advisors have not been named in this action. Nothing in the amended complaint suggests that any of the defendants (or their predecessors in interest) took any action or made any representation that prevented Wilson from learning about the issuance of the check or the subsequent transfer of funds. Although Wilson alleges that his trusted advisors never furnished him with a statement concerning the transfer of funds, Wilson does not allege that any of the defendants failed to *issue* such a statement. Similarly, while paragraph 127 in the amended complaint contains the conclusory allegation that one or more defendants fraudulently concealed the transfer, Wilson does not allege that he was denied access in any manner to information concerning the Ipswich Security Account.

"Our courts have determined that a plaintiff cannot simply ignore facts which should be obvious to him *or* would be *readily discoverable upon reasonable inquiry*." *S.B. Simmons Landscaping & Excavating, Inc. v. Boggs*, 192 N.C. App. 155, 161-62, 665 S.E.2d 147, 151 (2008) (emphasis added) (citing *Peacock v. Barnes*, 142 N.C. 215, 218, 55 S.E. 99, 100 (1906)). Moreover, even assuming that relationships of trust and confidence existed between Wilson and Synergy, and Wilson and JBS Liberty, Wilson's failure to use due diligence in discovering the allegedly fraudulent acts could be excused only if he were "actually deterred" from "suspecting or discovering the fraud." *Vail*, 233 N.C. at 116, 63 S.E.2d at 208. Based on the unique circumstances of this case, we conclude that had Wilson made a reasonably diligent inquiry, he could have discovered the acts of which he now complains, or the lack thereof. Our conclusion rests upon the notion that Wilson was ultimately responsible for his own affairs. If Wilson's advisors negligently or fraudulently deterred him from inquiring as to the status of the $250,000.00 principal (plus gains) contained in the Ipswich Security Account, those advisors should have been named in this action. Wilson has not alleged that any defendant denied him the opportunity to investigate,[5] and nothing in the amended complaint—apart from references to trusted advisors—

---

[5] We note that while paragraph 129 of Wilson's fraud claim contains a very general allegation that one of more of defendants "*are* intentionally withholding information"—meaning, currently withholding information—from him, Wilson fails to allege that he was denied the opportunity to investigate the Ipswich Security Account's status before or at the time when the allegedly fraudulent transfer took place (July 1999), or at any point until he discovered the check in 2013. (Emphasis added).

suggests that Wilson lacked the capacity to discover the alleged fraud when it supposedly occurred in 1999. Accordingly, Wilson's failure to use due diligence in discovering the alleged fraud has been established as a matter of law. Wilson's arguments are without merit, and the trial court properly concluded that all of Wilson's claims—including the claims against Synergy and JBS Liberty—were barred by the applicable statutes of limitations.

### III. Conclusion

For the reasons stated above, we affirm the trial court's order dismissing all of Wilson's claims against defendants.

AFFIRMED.

Judges BRYANT and INMAN concur.