Hart v. First Oak Wealth Mgmt., LLC, 2025 NCBC 11

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

STEVEN C. HART,

       Plaintiff,

   v.

FIRST OAK WEALTH
MANAGEMENT, LLC; DWM
ADVISORS, LLC; AIRIS ALEXANDER
ABOLINS; and JOSEPH P. DAVIS, III,

       Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21CVS015763-590

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1. **THIS MATTER** is before the Court on Motions for Summary Judgment filed by Defendant First Oak Management, LLC and Defendant Airis Alexander Abolins. (First Oak's Mot. Summ. J., [First Oak Mot.], ECF No. 47; and Abolins' Mot. Summ. J., [Abolins Mot.], ECF No. 51, collectively the Motions.) The underlying dispute arises from an alleged securities fraud scheme involving private investments. Plaintiff seeks damages from his investment advisers and their firms.

2. Having considered the Motions, the related briefing, and the arguments of counsel at a hearing on the Motions, the Court hereby **GRANTS in part** and **DENIES in part** the Motions.

*Mauney PLLC, by Gary V. Mauney, for Plaintiff Steven C. Hart.*

*Bell, Davis & Pitt, P.A., by Joshua B. Durham and Kevin J. Roak, for Defendant Airis Alexander Abolins.*

*Vann Attorneys, PLLC by James R. Vann and Ian S. Richardson, for Defendant First Oak Wealth Management, LLC.*

*Defendants DWM Advisors, LLC and Joseph P. Davis, III have not appeared.*

Earp, Judge.

## I.     FACTUAL BACKGROUND

3.     The Court does not make findings of fact when ruling on motions for summary judgment, but instead "summarizes the relevant evidence of record, noting both the facts that are disputed and those that are uncontested, to provide context for the claims and the Motions." *Aym Techs., LLC v. Rodgers*, 2019 NCBC LEXIS 64, at *2 (N.C. Super. Ct. Oct. 16, 2019) (citing *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975)).

4.     Plaintiff Steven C. Hart (Hart) is a hydrogeologist who operates a successful environmental consulting firm.   (Dep. Steve Hart [First Hart Dep.] 11:8−24, ECF No. 48.1; Dep. Steve Hart [Second Hart Dep.] 173:11−19, ECF No. 48.4.)  Given his status as an accredited investor, Hart is considered financially able to tolerate greater risk than other investors, giving him access to certain investments not generally available to the public at large.[1]   (Second Hart

---

[1] "Accredited Investor" is defined in Rule 501 of Regulation D, promulgated under the Securities Act of 1933, as amended.  It includes (a) a natural person whose net worth or joint net worth with their spouse exceeds $1,000,000 (not including the person's primary residence) or (b) an individual with annual income over $200,000 (individually) or $300,000 (with spouse or spousal equivalent) in each of the last 2 years and an expectation of the same this year. *See* 17 C.F.R. § 230.501(a)(5).  Accredited investors have access to private security offerings that are exempt from registration with the SEC and not publicly traded.  According to the SEC, "[o]ne reason these offerings are limited to accredited investors is to ensure that all participating investors are financially sophisticated and able to fend for themselves or sustain the risk of loss, thus rendering unnecessary the protections that come from a registered offering . . . . These offerings involve unique risks and you should be aware that you could lose your entire investment."  U.S. Sec. & Exch. Comm'n, Accredited Investors—Updated  Investor  Bulletin,  (April  14,  2021),  https://www.investor.gov/introduction-

Dep. 9:16−10:3; 13:3−7.) Outside of his dealings with Defendants, over the years Hart has invested between half a million and a million dollars in multiple real estate ventures in the Charlotte area. (Second Hart Dep. 139:20−145:2.)

5.      Defendant DWM Advisors, LLC (DWM) was formerly a North Carolina limited liability company that maintained its principal place of business in Durham County, North Carolina. (DWM's Statement of Change of Registered Office and/or Registered Agent, ECF No. 50.9.) Established in 2009, DWM provided financial planning and direct investment portfolio management services.

6.      By 31 December 2010, DWM was managing over $151 million in assets on a discretionary basis. (DWM Advisors LLC Brochure [DWM Brochure] 2, 4, ECF No. 50.26.) Initially, Defendant Joseph P. Davis, III (Davis), a registered investment adviser, was DWM's sole member manager and served as its chairman. (Aff. of Airis Abolins [Abolins Aff.] ¶ 3, ECF No. 50.68.)

7.      Defendant Airis Alexander Abolins (Abolins), joined DWM shortly after it began operations and had various titles including Director, Chief Investment Officer, and Senior Vice President for Research and Analytics. (Dep. of Airis Abolins [Abolins Dep.] 51:19−20, ECF No. 48.21.) In June 2010, Abolins became a 2.5% owner of DWM. (*See* New Member Signature Page to Operating Agreement of DWM Advisors, LLC [Signature Page], ECF No. 50.28; Abolins Aff. ¶ 3; Abolins Dep. 51:21−24.)

---

investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/updated-3 (last visited 14 March 2025).

8.      In its ADV Brochure[2] dated 27 April 2011, DWM represented that Abolins was "responsible for financial investments, investment model development, due diligence research on a variety of asset management strategies and securities analysis for DWM." (DWM Brochure A-3.) In addition, the brochure described Abolins' "primary focus" as "ensuring all aspects of DWM's clients' financial lives have been thoroughly reviewed, and making sure 'no stone is left unturned'." (DWM Brochure A-3.) DWM represented that Davis "supervise[d] all duties and activities of the firm and [was] responsible for all advice provided to clients." (DWM Brochure A-2.) DWM also represented that Davis was responsible for supervising Abolins' work. (DWM Brochure A-4.)

9.      Further, in its 27 April 2011 brochure, DWM represented that it owed fiduciary duties to its clients and described a Code of Ethics (the Code) that was available to all its clients upon request. (DWM Brochure 7.) The Code required Davis and Abolins "to act with honesty, good faith and fair dealing in working with clients." (DWM Brochure 8.) It set forth DWM's expectation that Davis and Abolins "put the interests of clients first, ahead of personal interests. In this regard, [Davis and

---

[2] The Form ADV is an annual filing that registered investment advisers are required to make with the Securities and Exchange Commission (SEC) and state securities authorities. *See* 17 C.F.R. § 275.203-1; U.S. Sec. & Exch. Comm'n, Form ADV, https://www.sec.gov/about/forms/formadv-part1a.pdf, (last accessed March 14, 2025.) Part 2 of the form requires investment advisers to prepare narrative brochures that include "in plain English" disclosures regarding the adviser's business practices, fees, conflicts of interest, code of ethics, and disciplinary information for both the firm and for any employee who provides advisory services to a client. Investment advisers are required to provide this brochure to their advisory clients and to supplement it promptly in the event there is new information regarding a disciplinary event. *See* U.S. Sec. & Exch. Comm'n, Investor Bulletin: Form ADV—Investment Adviser Brochure and Brochure Supplement (updated August 27, 2020), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-71# (last visited 14 March 2025).

Abolins] [were] not to take inappropriate advantage of their positions[.]" (DWM Brochure 8.)

10. The Code permitted Davis and Abolins to invest in the same securities that they recommended to their clients. However, "to reduce or eliminate conflicts of interest this could potentially cause" the Code contained procedures for limitations on these transactions, including pre-clearance from DWM's Chief Compliance Officer (CCO), Davis. (DWM Brochure 8.)

11. In Spring 2009, Hart and his wife sought to engage an investment advisory firm to assist them with the management of their assets as part of their plan for an early retirement. (Second Hart Dep. 21:13−23.) On the recommendation of a relative, Hart reached out to DWM as a potential adviser. (Second Hart Dep. 21:13−23.)

12. Hart says that he spoke with Abolins over the phone on 4 March 2009 concerning investment priorities. (Second Hart Dep. 25:4−20.) Abolins admits that he produced a questionnaire for use by Davis, but he testified that it was Davis who would "ask the questions and get the answers." (Abolins Dep. 23:15−21; 35:2−14.)

13. DWM then issued an action plan designed to meet Hart's investment goals. (*See* 28 May 2009 Action Plan for Steve and Lisa Hart, ECF No. 50.69.) The action plan for Hart reflected that he did not need to invest in high-risk securities to reach his financial goals.[3] Hart testified that DWM told him that he did not need to

---

[3] DWM reserved the right to "update" Hart's action plan "from time to time . . . when determined to be necessary or advisable by DWM based on updates to the client's financial or other circumstances." (DWM Brochure 2.)

take "a lot of significant risk" because he had "enough assets to basically meet [his] goals." (Second Hart Dep. 104:14–105:13.) In addition, Hart testified that—at least initially—he was willing to take some risks to achieve a higher return, but his view changed after DWM informed him that he could meet his goals with a more conservative allocation. (Second Hart Dep. 175:24–176:12.)

14. On 20 June 2009, Hart executed an Investment Advisory Agreement with DWM. (DWM Inv. Adv. Agreement, ECF No. 50.25.) The agreement between Hart and DWM specified that DWM had "full power to direct, manage, and change the investment and reinvestment of the assets in the Account . . . and to take other action with respect to such assets, all without prior consultation with or notice to [Hart.]" (DWM Inv. Adv. Agreement ¶ 1; DWM Brochure 2 ("As a discretionary investment adviser, DWM will have the authority to supervise and direct the portfolio without prior consultation with the client.").) Hart then moved his portfolio, which included publicly traded stocks, bonds, and mutual funds, as well as cash, to DWM. (Action Plans/Wealth Consolidation Reports [APs/WCRs] at First Oak 1203, ECF No. 59.11.[4])

15. Beginning on 1 July 2009 and continuing until May 2014, DWM made several investments on Hart's behalf, none of which was publicly traded. (Second Hart Dep. 27:10–12, 76:5–7.) Abolins contends that he was not involved in advising Hart on these investments because his sole focus was publicly traded securities.

---

[4] The Court references the bates numbers applied to the relevant pages of the APs/WCRs, which are compiled as one exhibit.

(Abolins Dep. 50:16−51:6.)  Abolins testified that Davis, alone, advised Hart on his private investments.  (Abolins Dep. 50:16−51:6.)

16.     Hart believes he only met in person with Abolins one time at a holiday party.  (Second Hart Dep. 17:14−18:17.)  He does not remember any of the phone conversations he had with Abolins.  (Second Hart Dep. 18:18−20.)  Abolins did, however, prepare what DWM called "Wealth Consolidation Reports" (WCRs), as well as action plans, and the ADV brochures that Hart received.  (Abolins Dep. 10:7−12:1).  Hart testified that he and Abolins sometimes reviewed his WCRs and action plans, and they discussed investments that Hart held "outside DWM."  (Second Hart Dep. 18:21−20:8.)

## The CarFab Investment[5]

17.     On 1 July 2009, acting on Davis' advice and, Hart believed, with Abolins' approval as DWM's chief investment officer, Hart invested $75,000 in Carolina Fabrication, Inc. (CarFab) in exchange for a promissory note that was payable on 30 June 2012.  (Second Hart Dep. 28:9−29:11, 29:22−31:9; Carfab/SSE Compilation of Materials [CarFab Compilation], ECF No. 50.66.)  Hart recalls that Davis told him that the investment was "fairly low risk, consistent with your investment objectives[.]" (Second Hart Dep. 31:25−32:7.)  Hart did no independent investigation, except at some point he went on the internet to see if the company had a website. (Second Hart Dep. 33:21−25; 36:6−14.)

---

[5] The facts are organized by investment, many of which overlap in time.

18. Hart later invested an additional $50,000 in CarFab in exchange for two more $25,000 three-year promissory notes, one payable on 13 December 2012 and a second payable on 13 October 2013. (CarFab Compilation at First Oak 208–210).[6]

19. Over the months that followed, DWM repeatedly represented that Hart's investment in CarFab was doing well. For example, in DWM's Portfolio Quarterly Performance Report for Hart's account dated 24 August 2010 and 8 December 2010, DWM reported gains in Hart's investment of almost $13,000. (APs/WCRs at First Oak 1233, Hart 720.) In APs/WCRs dated 7 April 2011 and 31 August 2011, DWM reported gains in the value of Hart's promissory notes of over $20,000 and $24,000, respectively. (APs/WCRs at Hart 719, First Oak 1266.)

20. On 16 July 2012, after he was not paid when his first note matured in June, Hart emailed Davis asking for an update on his investment. Davis reassured Hart that he would be paid interest on the note and added that there was a possibility that he could convert 50% of his investment to equity. (Second Hart Dep. 40:12–20; 16 July 2012 Email from Hart to Davis Re: Carolina Fab, ECF No. 48.8.)

21. In anticipation of the second promissory note coming due, Hart again emailed Davis on 30 August 2012 asking for an update and adding that he "get[s] worried when companies don't pay their debts on time[.]" (30 August 2012 Email, ECF No. 48.8.)

---

[6] The Court references the bates numbers applied to the relevant pages of the Carfab compilation exhibit.

22. When he still had not received payment on the CarFab promissory notes by October 2012, Hart again followed up with Davis, asking whether CarFab's guarantors had provided the required financial information, and stating that he wanted a "pay back of the loan" and was "not sure that taking a stake in the company is of interest to [him]." (12 October 2012 Email, ECF No. 48.10.) A day later, Davis replied that he understood Hart's concern and that "[p]riority one [was] to get our principal back." (17 December 2012 Email, ECF No. 48.9.)

23. In November, Hart wrote that he "never received a response from his earlier email . . . about whether we had been receiving financial information about each guarantor including tax returns, etc., as required in the guaranty agreement." Hart expressed that he was "very concerned" and was "prepared if necessary to hire [his] own legal counsel, make a demand on Car Fab [sic], and then if they don't make good on the notes (including the one that is about to be due), and to (sic) go after the guarantors. I don't want for it to get to this but I also can't afford to lose $200,000." (15 November 2012 Email, ECF No. 48.10.)

CarFab's Conversion to SSE

24. Meanwhile, in a letter to Hart dated 25 September 2012, Davis told Hart that he had instructed his law firm, James, McElroy and Diehl, to come up with a "workable plan" to resolve CarFab's financial issues. (CarFab Compilation at Hart 432.) Ultimately, acting at Davis' direction, the attorneys drafted a settlement agreement between CarFab and its noteholders because CarFab was "not able to

make payments of principal and interest upon . . . the loans." (CarFab Settlement Agreement at Hart 424, ECF No. 59.12.)

25. The Settlement Agreement proposed to transfer all CarFab's stock to a new entity, SSE Group, LLC (SSE). Pursuant to its terms, all CarFab's noteholders, including Hart, were to assign their notes to SSE in exchange for its shares. (CarFab Settlement Agreement at Hart 424.)

26. Meanwhile, SSE's Offering Memorandum disclosed that Davis was issued the sole Class B Unit, the only voting unit, and was the only member of the company. (15 January 2013 Confidential Private Offering Mem. SSE Group, LLC [SSE Offering Mem.] 1, ECF No. 50.48.) Davis was also identified as the Founding Member and the Manager of SSE with "virtually the sole right to direct the operations and business of the Company." (SSE Offering Mem. 6.) Hart admitted that he was aware that Davis "was involved somehow as part of [SSE's] management team or board of directors or something like that." (Second Hart Dep. 57:12–24.)

27. SSE's Offering Memorandum repeatedly warned that the securities offered involved a high degree of risk. (SSE Offering Mem. 1, 6, 8.) Investors were required to represent that they were familiar with and understood those risks. (SSE Offering Mem. 2.) They were told that the offering price of the units did "not necessarily bear any relationship to . . . [any] recognized criteria of value[,]" (SSE Offering Mem. 2), and that they "should be prepared to suffer a loss of their entire investment." (SSE Offering Mem. 6.) Investors were advised that they could ask questions of the manager or make other inquiries with respect to the securities

offered and obtain any information they deemed necessary to verify the accuracy of information in the Offering Memorandum. (SSE Offering Mem. 2, 6.) However, investors were also advised not to construe the contents of the Offering Memorandum as advice and to consult their advisors concerning the investment. (SSE Offering Mem. 2.) The shares were offered only to accredited investors such as Hart, who either personally (or through his representative) had "such knowledge and experience in financial and business matters that he [was] capable of calculating the merits and risks of this investment[] and [was] capable of protecting his own interests[.]" (SSE Offering Mem. 8.)

28. Meanwhile, Hart, who had asked Davis for CarFab's financial statements and tax returns, told Davis that he was not sure that "taking a stake in the company [was] of interest to [him.]" (Second Hart Dep. 49:3−21; 50:3−6.) Despite his hesitance, Hart signed a settlement agreement and became a shareholder in SSE. (Second Hart Dep. 51:12−25, 52:16−22.) He admits that when he signed the agreement he did not go through it "in excruciating detail," and he did not consult legal counsel because Davis told him that the deal James, McElroy and Diehl put together protected Hart's personal interests. (Second Hart Dep. 53:22−54:13, 55:22−56:8, 57:3−11.) Hart testified that he agreed to the deal because he "was told by [his] fiduciaries that this is what needed to be done in order to get [his] money out of CarFab." (Second Hart Dep. 60:11−13.)

29. On 16 April 2013, Davis, as Chair and Managing Director of SSE, emailed CarFab's investors, including Hart, to inform them that the SSE transaction

had closed. Davis also told them that CarFab had received several large orders from new customers, along with additional orders from an existing customer, Integro Earth Fuels, Inc. (Integro).[7] Davis projected that Integro would have $6 million in orders for CarFab in 2013. (4/16/13 Email from Davis to Hart, RE: CarFab Update, ECF No. 59.16.)

30. On 28 April 2014, Davis, again acting in his capacity as Manager of SSE, notified investors of a $500,000 capital call, requiring Hart to pay in another $5,257.46. (CarFab Compilation at Hart 386.) In a separate email dated 1 May 2014, Davis emailed investors encouraging them to respond to the capital call because "orders were starting to flow" and telling them that "[t]his is no longer a crisis but an opportunity" and "success could be just around the corner." (1 May 2014 Email from Davis to Hart, ECF No. 59.13.) Hart interpreted Davis' message to mean that meeting the capital call was "a great opportunity for everybody to make money, as opposed to the I guess crisis." (Second Hart Dep. 64:13−14; 68:25−69:4.) He responded to the capital call by wiring the requested amount on 2 June 2014. (CarFab Compilation 57−58.)

31. The promised opportunity did not materialize. Even though the WCRs prepared by Abolins reflected growth in his CarFab/SSE investment as late as March 2015, the investment had collapsed to nothing by August 2015. (Second Hart Dep. 44:8−12, 199:17−25; 9 March 2014 WCR, First Oak 1352; 3 September 2015 WCR, First Oak 13; ECF No. 50.67.) It was Davis who informed Hart "later in 2015"

_____

[7] Integro Earth Fuels was another privately held entity that Davis controlled through Montague Capital, LLC. *See infra* ¶¶ 52−53.

that his investment in CarFab/SSE was worthless and he would recover nothing, despite Davis' earlier representations that CarFab/SSE's assets would be sufficient to cover any loss. (Second Hart Dep. 41:23–44:12, 200:13–14.) And, even though the Investment Advisory Agreement he signed stated that DWM's fee would be based on the market value of his investments, throughout the time he held CarFab/SSE, DWM charged Hart fees "at full value." (Second Hart Dep. 56:3–8.)

32. As its manager, Davis dissolved SSE on 15 December 2015 and his investment in CarFab/SSE disappeared from Hart's WCRs. (Second Hart Dep.209:14–20; CarFab Compilation 95.)

### The IQMax Investment

33. A few months after Hart invested in CarFab in 2009, Davis suggested that he also invest in IQMax, Inc. (IQMax). Hart does not recall if he did any independent research on the company other than perhaps checking to see if it had a website. He testified that he was relying on his fiduciaries to do that work. (Second Hart Dep. 14:21; 71:14–21, 72:4–13.) While he had discussions with Abolins about his investments generally, however, Hart does not recall a conversation with Abolins in which Abolins recommended that he invest in IQMax. (Second Hart Dep. 71:22–73:5; 74:24–75:4.)

34. On 8 October 2009, Hart initially invested $50,000 in IQMax in exchange for a promissory note. (DWM Chronology of Hart Private Investments [DWM Chronology], ECF No. 59.17.) Less than a year later, on 23 July 2010, Hart invested another $50,000 in IQMax in exchange for a second promissory note.

(25 August 2010 Letter from Updegraft to Hart at Hart 895, ECF No. 50.46; DWM Chronology.)  On 26 April 2011, Hart again invested $50,000 in exchange for a third promissory note, bringing his total investment in IQMax to $150,000.  (DWM Chronology.)  Hart also exercised warrants to purchase 11,700 shares of IQMax stock.  (Second Hart Dep. 78:18–79:11.)  He does not contend that any of these transactions occurred without his knowledge.  (Second Hart Dep. 77:3–18.)

35.     Both Davis and Abolins had interests in IQMax.  In fact, Davis owned 8.46 percent of the company, the third highest stake, and served as Chair of its Board of Directors.  (IQMax Note Exchange at Hart 1119, 1121, ECF No. 59.20.)  Davis also had a consulting agreement with IQMax through a separate company, Exchange Notes, LLC, for which he received at least $114,000 through 2012.  (IQMax Note Exchange at Hart 1122.)   Hart was aware that Davis was involved in the management of the company as a member of its Board, but because he relied on DWM to advise him, he only "breezed through" the materials he was provided and was not aware that Davis was being paid by IQMax.  (Second Hart Dep. 13:10–25, 82:7–9, 87:22–88:23, 89:6–10.)

36.     Abolins also had an ownership stake in IQMax.  He owned 5,000 shares of the company at the time Hart first invested and had increased his stake to 15,000 shares by 22 June 2012.  (Abolins IQMax Share Certificates, ECF No. 59.21.)

37.     The only IQMax promissory note in the record reflects that it was not registered under the Securities Act of 1933 or state securities laws and that it was

subordinated to other debt. (IQMax 12.00% Subordinated Term Note, ECF No. 50.46, Hart 896.)

38. As for IQMax shares, the Subscription Agreement Hart signed stated that the investment "involved a high degree of risk in that . . . [it is] highly speculative and only investors who can afford the loss of their entire investment should consider investing in the Company and the Units[.]" (IQMax, Inc. Subordinated Term Note Subscription Agreement ¶ 1.2, ECF No. 50.20.) By investing, Hart agreed that he was an accredited investor, that he was able to bear the economic risk of investment, that he had prior investment experience or had employed the services of an investment advisor to evaluate the merits and risks of the investment, and that he recognized the highly speculative nature of the investment. (IQMax, Inc. Subordinated Term Note Subscription Agreement ¶ 1.3.) He confirmed that, prior to investing, he had been furnished with all the information he desired to know, and he had been afforded the opportunity to ask questions of and receive answers from representatives of the Company. (IQMax Form of Subordinated Term Note Subscription Agreement ¶ 1.4.)

39. Nothing in the WCRs that Hart received from DWM thereafter reflected that his IQMax promissory notes were in danger of default. To the contrary, the WCRs showed that interest was accruing and that the notes were steadily increasing in value. (*See, e.g.*, APs/WCRs at First Oak 1233, 1249, 1266, 1315, Hart 638, 655, 667, 675, 718, 720.)

40.     On 16 July 2012, in response to Hart's request for an update on his private investments, Davis asked Hart to call him because he had "good news" on IQMax.  (16 July 2012 Email from Davis to Hart Re: Carolina Fab, ECF No. 50.24.)  It is not clear from the record what that good news was.  However, notice of a shareholders meeting dated 27 August 2012 told investors that they were being asked to vote on measures to strengthen IQMax's corporate governance and raise additional capital "to fund its growth."  (27 August  2012 Letter to IQMax Shareholders, ECF No. 50.53.)

41.     In February 2013, on Davis' advice, Hart agreed to convert his promissory notes to IQMax common shares.  (APs/WCRs at First Oak 1279.)  In the offering materials Hart received, IQMax stated that it had recorded losses for every operating year of its existence and had cumulative losses through 31 December 2011 totaling $32 million.  (IQMax Note Exchange at Hart 1115.)[8]

42.     Thereafter, DWM continued to produce WCRs that reflected gains in Hart's investment in IQMax.  As of October 2016, the date of Hart's last WCR with DWM, his total investment in IQMax and IQMAX Healthcare, LLC was reported as having a value of $163,876.59.  (Hart's Last Client Return Summary Net of Fees with DWM, ECF No. 48.15.).

---

[8] In 2013 IQMax formed IQMAX Healthcare, LLC reportedly to focus on the healthcare industry.  Hart, as an equity stakeholder in IQMax, received 10,432 units in IQMAX Healthcare, LLC.  (9 December 2013 Letter from IQMax to Hart, ECF No. 50.22; IQMAX Healthcare, LLC Certificate C-95, ECF No. 50.21.)  Hart now believes that IQMAX Healthcare, LLC was created as a holding company for IQMax's debt.  (Second Hart Dep. 83:1−6.)

43. The record is silent with respect to IQMax from October 2016 until sometime after April 2018, when a third-party purchased the assets of IQMax. (Second Hart Dep. 83:7−13.) Hart was told that he did not need to sign any paperwork because the deal was already done, and he received nothing as a result of the transaction. (Second Hart Dep. 83:7−13, 83:24−85:7.) He attempted to contact Davis for more information but was unable to reach him. (Second Hart Dep. 84:12−18.)

The Montague Investments

44. In 2011, again acting on Davis' advice, Hart expanded his private holdings with the assistance of Montague Capital Partners, LLC (Montague), a private equity investment firm managed by Denis Kalenja, Davis' friend, who had been involved in the debt restructuring of both CarFab and IQMax.[9] (Abolins Dep. 59:13-16.) Interestingly, Montague had the same street address as Davis' suite, next door to DWM Advisors. (9 September 2011 Pacific E-Commerce, LLC Confidential Private Placement Mem. 7 [Pac Commerce Offering Mem.], ECF No. 50.58; Abolins Dep. 68:4−11, 69:6−15, 72:5−10.)

45. Hart testified that the agreement he received for Montague was "pre-populated" by DWM, and all he did was initial and sign the document where his DWM advisors told him to. (Second Hart Dep. 98:23−99:24, Montague Capital LP Sub. Agreement, ECF No. 50.55.) When asked if he read the agreement, Hart testified that he "just kind of went through it briefly but certainly not in detail because that's

---

[9] Montague also held Class B series stock in IQMax. (Second Hart Dep. 96:18−23; Abolins Dep. 82:6−8.)

what I was hiring the folks at DWM to do on my behalf, as my fiduciary, to make sure this was all in order when they sent it to me to be signed." (Hart Second Dep. 100:19–24.) Even so, he does not recall any conversations with Abolins about Montague, only that Abolins included Montague on his WCRs. (Second Hart Dep. 103:16–24.)

46. Hart made the first of his Montague-related investments in September 2011, when he invested $51,000 to buy stock in Pacific E-Commerce, LLC (Pac Commerce), a Delaware limited liability company owned and solely managed by Montague, and by extension, Kalenja. (Pac Commerce Offering Mem. at Hart 523; Pacific E-Commerce, LLC Signature Page for Steven Hart [Pac Commerce Signature], ECF No. 50.57.) Pac Commerce was formed to invest in Yobrand, Ltd., a Cayman Islands company that operated "one of China's leading business-to-consumer e-commerce platforms, focusing on fashion accessories targeting urban trend-conscious consumers." (Pac Commerce Offering Mem. at Hart 528.) Pac Commerce intended to invest at least $600,000 in Yobrand, Ltd. in exchange for an unsecured convertible promissory note at a 6% rate of return. (Pac Commerce Offering Mem. at Hart 532.)

47. The Pac Commerce Offering Memorandum stated in all capital letters on its cover page that "Investments offered by this Memorandum are not redeemable at the option of their holders and the holders will not have the right to withdraw their capital. An investment in the Interests is speculative and involves a high degree of risk." (Pac Commerce Offering Mem. at Hart 522.) Only accredited investors were

eligible to participate, and they were warned that the investment was speculative, involved significant risk, and that they should have the "financial ability and willingness" to "sustain the loss of the entire investment." (Pac Commerce Offering Mem. at Hart 525.) Among other warnings, investors were advised to consult with their legal, tax, and financial advisers before deciding whether to purchase stock. (Pac Commerce Offering Mem. at Hart 555.)

48. Although he received it, Hart testified that he does not recall whether he reviewed the Offering Memorandum. (Second Hart Dep. 110:9–13.) He does not recall, for example, being aware that Kalenja had involvement in the financial and strategic restructuring of both CarFab and IQMax. (Second Hart Dep. 111:17–22.)

49. As manager, Montague, and by extension, Kalenja, received an annual management fee equal to 2% of the contributed capital of its investors, as well as any expenses the manager incurred in performing its duties. Montague had the right to make a capital call for the sole purpose of paying the management fee. (Pac Commerce Offering Mem. at Hart 537–39.)

50. When the investment in Yobrand, Ltd. did not close in December 2011, Pac Commerce returned $1,000 of Hart's investment, but it reinvested the balance of Hart's money in another venture, SleepSafe Drivers, Inc. (SleepSafe). (21 December 2011 Letter from Winkelman to Hart Enclosing Yobrand Refund Check, ECF No. 50.80; Abolins Dep. Ex. 57 at Hart 314–16, ECF No. 59.3; Second Hart Dep. 108:16–109:7.) Hart testified that he did not receive information from DWM about SleepSafe, but in doing his own research on the Internet, he learned that

it was a "company that manages truck drivers that have sleep apnea." (Second Hart Dep. 112:10–18.)

51. Over the years, Hart has received approximately $15,000 from SleepSafe, which he believes is still "an ongoing entity." (Second Hart Dep. 16:5–16; 112:19–113:20.) He testified that he thought he had received dividends from his investment in SleepSafe of about $5,500 each year for the last three years. (Second Hart Dep. 113:15–16.) The last WCR from DWM in October 2016 reported that Hart's investment in SleepSafe remained unchanged at $50,000. (Hart's Last Client Return Summary Net of Fees with DWM, First Oak 1373.)

52. On 21 March 2012, Hart invested another $100,000, this time in Montague Capital, LP, (Montague Capital), a limited partnership formed by Montague. (Hart Second Dep. 190:3–7.) Hart was informed that his "Class D" limited partnership interest in Montague Capital was a private placement that was exempt from regulation by the SEC. (Montague Subscription Agreement 1.)

53. Montague Capital purchased a note from Integro. (Second Hart Dep. 16:17–17:1; 94:15–21.) Again, Hart testified: "So my understanding is that the folks at DWM had evaluated Integro as a suitable investment for me and my goals, that we were going to take back a note, a promissory note. That's what was invested in this Class D of Montague Capital. And that they had done that leg work for me. That's what I paid them to do." (Hart Second Dep. 105:21–106:3.)

54. In his 2013 tax filings, Hart represented that he had received $6,794 in interest from his holdings in Montague Capital. (25 March 2013 Global Fund Servs.,

LLC Global P'ship Form 1065 Schedule K-1 RE: Montague Capital, ECF No. 50.75.) Even as late as October 2016, when DWM sent Hart its last WCR for his account, it reported that Hart's investment in Integro had a $8,000 gain. (Hart's Last Client Return Summary Net of Fees with DWM, First Oak 1373.)

55. Hart's investment in Montague Capital was later "closed out . . . in exchange for [Hart] taking a note directly from Integro." (17 April 2017 Email from Steven Hart to Jake Figg RE: Montague Disposal, ECF No. 50.56.) However, Hart does not know what ultimately happened to the Integro note. (Hart Second Dep. 107:17−18.)

56. Hart does not recall whether he spoke with Abolins specifically about the Montague investments, but he recalls conversations with Abolins about both his tax forms and his WCRs, which referenced all of his investments. (Second Hart Dep. 103:16−24.) In short, Hart believed that "the folks at DWM" had evaluated the risks associated with Montague, thought it was consistent with his investment objectives, and recommended it to him. (Second Hart Dep. 104:8−13.)

57. Abolins testified that it is possible that he saw Montague Capital's financial records and the Subscription Agreement Hart signed. He remembers reviewing account statements for clients that mentioned Montague Capital. But overall, Abolins testified that he relied on Davis and on statements from Montague when preparing the WCRs. (Abolins Dep. 61:7−63:3, 67:23−68:3.)

## The ADA Capital Investment

58.    In February 2013, again on Davis' advice, Hart invested $100,000 in a hedge fund, ADA Capital Group, Inc. (ADA Capital).  (February 7, 2013 Email from Steven Hart to Mamie Winkelman Re: ADA Wire, ECF No. 50.59.)  Hart understood that ADA Capital was formed to acquire undervalued assets identified by its management team, assist them to obtain full value, and then sell them.  (Second Hart Dep. 116:21–23; ADA Capital Group, Inc. Confidential Private Offering Mem. [ADA Capital Offering Mem.] 6, ECF No. 50.61.)

59.    In its offering memorandum ADA Capital represented that its securities were "extremely speculative," not registered under federal securities law, involved a high degree of risk, and that only accredited investors "who can bear the loss of their entire investment should invest in these shares."  (ADA Capital Offering Mem. 1.) The memorandum warned that ADA Capital had no revenues and that it anticipated losses for the foreseeable future.  (ADA Capital Offering Mem. 10.)

60.    By investing, Hart represented that he recognized the need to conduct his own thorough investigation and due diligence.  (ADA Capital Offering Mem. 3.) ADA Capital represented that it would make available to any prospective qualified investor "the opportunity to ask questions and receive answers from the Company or persons acting on behalf of the Company concerning the terms of the Offering and the proposed business and operations of the Company[.]"  (ADA Capital Offering Mem. 5.)

61. Hart contends that Davis pressured him to invest $200,000 in ADA Capital because it was "going to be a home run." (Second Hart Dep. 118:21−24.) Hart, however, decided to invest $100,000 because he was uncomfortable going as high as $200,000. (Second Hart Dep. 120:4−14.)

62. ADA Capital's Offering Memorandum reported that Davis was Chair of its Board of Directors and would be compensated $10,000 monthly. (ADA Capital Offering Mem. 18, 20.) In addition to his monthly compensation, at the time of the offering Davis owned fifty percent of ADA Capital's stock.[10] (ADA Capital Offering Mem. 14, 18.)

63. When he examined the offering materials, Hart recalls spotting the disclosure that Davis, as chair, would receive a monthly compensation of $10,000 "some or all which may come from contributions of investors[.]" (Second Hart Dep. 121:18−24; ADA Capital Offering Mem. 20.) He confronted Davis about it, who told Hart that the information was a mistake and that he was not actually taking a salary from ADA Capital. (Second Hart Dep. 121:24−122:5.) Hart does not know, and the record does not reflect, whether Davis actually took the money after he promised not to. (Second Hart Dep. 122:19−22.)

64. Despite the fact that Davis was a controlling shareholder of ADA Capital, Hart testified that he trusted Davis and relied on "DWM folks" to do the "right thing." (Second Hart Dep. 122:17−18.)

---

[10] The balance was owned by Donald E. Collins, the Chief Executive Officer and President of ADA Capital and a personal friend of Davis. Both Davis and Collins paid for their shares with service, according to the offering memorandum. (ADA Capital Offering Mem. 11, 13−14.) Control was vested in Davis and Collins. (ADA Capital Offering Mem. 10.)

65. In December 2013, Hart attended ADA Capital's annual shareholder meeting where he received materials listing Davis as Chair of ADA Capital's Board. (Second Hart Dep. 124:1−4.) Hart did not object to Davis being Chair. (Second Hart Dep. 125:11−20.) In addition, at the meeting, ADA Capital reported that it was investing in a steel fabrication business and a green energy company, which Hart now believes were CarFab and Integro, respectively. (Second Hart Dep. 15:15−20; 128:3−21.)

66. Abolins was not at the ADA Capital meeting in December, and Hart does not recall any conversations with Abolins about ADA Capital. Nevertheless, he maintains that Abolins "was certainly aware of the investments. They showed up on my wealth consolidation report." (Second Hart Dep. 117:7−9.)

67. Abolins was aware that the ADA Capital offering memorandum stated that Davis would receive a $10,000 monthly salary from ADA Capital, and he believes that Davis disclosed this conflict to Hart. (Abolins Dep. 155:6−156:7.) However, Abolins was not present when Davis and Hart discussed the issue and Davis denied being paid a salary. (Abolins Dep. 160:6−17.)

<u>Hart's Wealth Consolidation Reports (WCRs) from DWM</u>

68. At least by December 2010, the WCRs from DWM contained footnotes designated by asterisks at the bottom of the page under the small subheading "Notes." The first footnote reads: "IQmax equity valued at cost; values of CarFab and IQmax Notes stepped up quarterly as interest accrues[.]" (APs/WCRs at Hart 720.) The WCR also includes the following disclaimer in a footer:

> The above summary of prices/quotes/statistics contained herein has been obtained from sources believed to be reliable but is not necessarily complete and cannot be guaranteed. In some instances the prices may not reflect the value at which securities could be sold. This summary is for informational purposes only. This is not a substitute for a Verification of Deposit or the official statement of account holdings at the firm. Past results not indicative of future performance.

(APs/WCRs at Hart 720.) This disclaimer is repeated on every WCR prepared for Hart throughout his relationship with DWM.

69. In December 2011, the first footnote was amended to say that both IQMax equity and SleepSafeDrivers were valued at cost. (APs/WCRs at Hart 717.)

70. In January 2013, Montague Capital (Integro) appears on Hart's WCR from DWM. The report indicates that Hart holds a convertible note valued at $105,317.91. There is no footnote explaining how this value was calculated. (APs/WCRs at Hart 690.)

71. In July 2013, the WCR footnotes were expanded to include one for SSE. The footnote reads, "SSE Group is conversion of Carolina Fab Note to equity . . . SSE net contributions is original [CarFab] note principal less checks rec'd less cash payout." (APs/WCRs at Hart 675.) CarFab itself no longer appears on the WCR. The July 2013 WCR also reflects Hart's investment in ADA Capital at the amount of the investment, $100,000.00. No footnote appears for ADA Capital. (APs/WCRs at Hart 675.)

72. The June 2014 WCR shows gains in Hart's investments in SSE Group ($45,969.85), IQMax ($25,709.59) and Integro ($13,477.77). The footnotes regarding

how these values were calculated, as well as the disclaimer, continue to appear. (APs/WCRs at Hart 667.)

73.    The August 2014 WCR reflects a $45,969.85 gain in the value of Hart's SSE Group investment with no limiting footnote.  IQMax shows a $25,709.59 gain, which is footnoted to specify that the number is cost plus interest accrued from the IQMax Notes.  The SleepSafe preferred stock and the ADA Capital hedge fund continue to be valued at their respective costs of $50,000 and $100,000, with no additional information.  The Integro convertible note shows a gain of $40,929.99, with no additional information.  (APs/WCRs at Hart 644.)

74.    Finally, the March 2015 WCR continues to report a gain of $45,969.85 in the value of Hart's SSE Group investment with no limiting footnote.  Likewise, IQMax continues to show a $25,709.59 gain, which is footnoted to specify that the number is cost plus interest accrued from the IQMax Notes.  The SleepSafe preferred stock and the ADA Capital hedge fund continue to be valued at their respective costs of $50,000 and $100,000, with no additional information.  The Integro convertible note gain has been reduced from $40,929.99 to $11,926.80, with no additional information.  (APs/WCRs at Hart 638.)

Hart Stops Investing in Private Investments

75.    On 5 May 2014, Hart informed Davis via email that, after he paid the CarFab capital call, he would not "for the short term" invest any additional amounts in "high risk investments" because he felt that he had "not received a lot in return[.]" (5 May 2014 Email, ECF No. 48.11.)  Hart complained that he had not been receiving

enough information from Davis and DWM and that he wanted to "see more regular updates, balance sheets, P&Ls [profit and losses], etc[.] from these investments." (5 May 2014 Email.) Hart specifically complained about his investments in CarFab, ADA Capital, and IQMax. He did not understand how the CarFab investment had collapsed or how ADA Capital had racked up $500,000 in expenses. Furthermore, Hart was frustrated that he had received nothing after waiting three years for IQMax to be sold. (5 May 2014 Email.)

76. Hart concluded his 5 May 2014 email to Davis:

> I have been worrying a lot about these investments lately, and feel like that is what we pay you all [DWM] to do (and I know you have been worrying about them too and working hard to make them work). In my case, less information leads to more worry, so I need more information on a regular basis. And some concrete returns would be nice too.

(5 May 2014 Email.) Nothing in the record indicates that Davis responded to Hart's email.

77. After his final payment to satisfy the capital call for CarFab in June 2014, Hart believes that he did not put any more money in private investments, either with DWM or later with First Oak. (Hart First Dep. 30:5−12, 76:5−7.) Gregory Reagan, Plaintiff's expert, cannot say with certainty when each of Hart's private investments became worthless, but he believes that most of them had likely declined to zero by December 2017. (Dep. of Gregory Reagan [Reagan Dep.] 87:6−14, 89:3−12, 90:1−11, ECF No. 48.2.)

78. Hart was aware that his CarFab / SSE investment was worthless by late 2015. (Second Hart Dep. 209:4−10.) He knew by April 2018 that IQMax has sold its

assets and that he had received nothing. He testified that SleepSafe was still afloat at the time of his deposition and was paying relatively small dividends. It is not clear from the record what happened to ADA Capital (as of 14 October 2016, Hart's Client Return Summary from DWM values it at $100,000) or the Integro promissory note (valued on the same DWM report at $108,193.13). (APs/WCRs at Hart 634.)

79.    Hart repeatedly testified that he did not distinguish between Davis and Abolins when it came to his dealings with DWM: "There was a managing partner. There was a chief investment officer. And to the extent that a recommendation was made, that it was them doing that as a company. And if it was an investment, it had been vetted by the chief investment officer, who was Airis Abolins . . . I don't distinguish them." (Second Hart Dep. 72:22–73:13.) He added, "I didn't hire Joe or Airis individually." (Second Hart Dep. 74:2–4.)

## First Oak is Formed

80.    By 2017, several of DWM's former clients had filed suit against Davis, DWM, and Abolins, alleging fraud arising out of their investments. (*See, e.g.*, Bryan Complaint Against Davis/Abolins, ECF No. 61.28; Price Family Confession of Judgment by Davis/DWM, ECF No. 61.31.)[11]   In addition, regulators had begun focusing on Davis'—and by extension DWM's—transactions.

---

[11] The Court takes judicial notice of the pleadings in these cases. *See Herrera v. Charlotte Sch. of Law, LLC*, 2018 NCBC LEXIS 35, at *21 (N.C. Super Ct. Apr. 20, 2018) ("[W]hen a party requests that the Court take judicial notice of a fact and supplies the Court with the necessary information, the Court is required to take judicial notice of the fact if it satisfies Rule 201(b)."); *see also* N.C. R. Evid. 201(d).

81. At about this time, Davis told Abolins he had been diagnosed with cancer and wanted to retire. He and Abolins decided to sell DWM's assets. (Abolins Dep. 213:4–17.) Ryan Thomsen, an investment advisor representative with Oak City Consulting, LLC, was in the process of establishing his own investment firm and expressed interest. (Thomsen Dep. 19:12–20:8, 23:8–9, ECF No. 59.32.) Abolins introduced Thomsen to Davis, who told Thomsen that he sought to sell only the publicly traded portion of DWM's client accounts. (Thomsen Dep. 21:11–22.) Thomsen testified that he was told that DWM no longer managed private investments, which was important to Thomsen because he had never managed private investments and was not familiar with them. (Thomsen Dep. 28:9–20.)

82. According to Thomsen, during the due diligence process, neither Davis nor Abolins disclosed any regulatory problems. (Thomsen Dep. 35:14–25.) However, Thomsen was aware that lawsuits had been filed against DWM and Davis for "[u]nsuitable investments related to private equity." (Thomsen Dep. 38:10–12.)

83. The discussions among Abolins, Davis, and Thomsen led to Abolins filing articles of organization for First Oak with the North Carolina Secretary of State on 12 January 2017. (Articles of Organization for First Oak Wealth Mgmt., LLC, ECF No. 50.14.) At its formation, Thomsen owned eighty percent of First Oak, while Abolins owned the remaining twenty percent. (Abolins Dep. 300:21–25; Aff. of Ryan Thomsen ¶ 9, ECF No. 48.5.)

84. A month later, on 20 February 2017, DWM and First Oak entered into an asset purchase agreement transferring DWM's public investment accounts to First

Oak.[12] (*See generally* Asset Purchase Agreement, ECF No. 48.12.) The agreement disclosed pending lawsuits against DWM, Abolins, and Davis related to ADA Capital, among other investments. (Asset Purchase Agreement Schedule 6.1(h).)

85. In exchange for its accounts, DWM received a lump sum of $250,000. (Asset Purchase Agreement ¶ 2.1.) Forty-thousand dollars of the purchase price was allocated to Abolins, and Davis received the balance. Davis also received a contract to consult in exchange for a fee equal to fifteen percent of First Oak's billings generated from the acquired assets, as well as any new business that Davis brought in. (31 Mar. 2017 First Oak Wealth Mgmt. Indep. Consulting Agreement, ECF No. 50.36.)

86. In an exhibit to the APA, First Oak and DWM clarified that the asset purchase agreement excluded "[a]ny [of DWM's] client contracts, relationships or servicing arrangements that are not related to publicly traded securities, such as, for example, those that relate to private equity and hedge fund investments." The exhibit specifically named ADA Capital, Integro, IQMax, IQMAX Healthcare, Inc., Montague, and SleepSafe as investments that were excluded from the asset purchase agreement and remained with DWM to manage. (Asset Purchase Agreement, Ex. C.)

87. Thomsen testified that he intentionally excluded DWM's private investments from the APA because he did not want to manage them. (Thomsen Dep. 217:2−14.) Abolins similarly recalls that the APA excluded these investments

---

[12] In addition to all DWM's clients, Thomsen brought over fifty clients from Oak City Consulting, LLC effective 1 April 2017. (Thomsen Dep. 18:4−19.) None of these clients had private investments. (Abolins Dep. 300:9−16.)

"because, A, First Oak really just wanted to do vanilla ice cream, in other words, stocks, bonds, ETFs [exchange-traded funds], mutual funds; B, these had everything to do with Joe Davis and really nothing to do with either [Abolins or Thomsen]. And neither [Abolins nor Thomsen] really wanted to have [these investments]." (Abolins Dep. 299:14−21.) Meanwhile, DWM withdrew from registration as an investment advisor on 16 May 2017, three months after the effective date of the Asset Purchase Agreement. (16 May 2017 Form ADV-W Not. Withdrawal Registration Inv. Advisor DWM, ECF No. 50.44.)

88.     On 24 February 2017, Davis sent a letter to Steve and Lisa Hart on DWM's letterhead informing them that DWM had decided to join with Thomsen to form First Oak. Davis informed Hart that the new entity would be partnering with Great Lakes & Atlantic Wealth Management and Advisory Partners, LLC (Great Lakes), another North Carolina Registered Investment Advisor, to provide "additional resources to our practice to further enhance your experience with us." (24 Feb. 2017 Letter from Davis (DWM) to Steven and Lisa Hart [24 Feb. 2017 Letter], ECF No. 50.63.)

89.     In the February 2017 letter, Davis represented that DWM's "day-to-day business relationship with [Hart] [would] remain unchanged, with the entire team, including Ryan, handling all aspects of managing and advising [clients] in regards to [Hart's] financial affairs." In conclusion, and without distinguishing between Hart's private and publicly traded investments, Davis asked Hart to consent to an assignment of his account to First Oak. Davis added that consent would be assumed

if Hart did not complete and send the enclosed opt-out form to DWM. Nowhere in the letter did Davis specify that Hart's private holdings would not transfer to First Oak or that DWM would soon cease to operate. (24 Feb. 2017 Letter.)

90. Just three weeks later, on 17 March 2017, the South Carolina Securities Commissioner issued a consent order determining that Davis had:

> (a) recommended to one or more South Carolina client(s) that the client(s) invest in private placements not suitable or appropriate for the client(s) given the client(s) investment objective(s) and the risk profile(s) and (b) failed to disclose one or more conflicts of interest . . . that may have influenced the giving of such advice[.]

The consent order permanently barred Davis and DWM from the securities industry in South Carolina. (South Carolina Securities Commissioner Consent Order, ECF No. 50.31.) By the time Davis entered into this consent order, First Oak had acquired the agreed-to assets of DWM and had begun operations. (Articles of Organization for First Oak Wealth Mgmt., LLC; Asset Purchase Agreement.)

91. On 27 April 2017, on behalf of First Oak, Abolins emailed clients, including Hart, to inform them that the transition from DWM Advisors to First Oak had been completed, that "everything is business as usual as [First Oak] service[s] and manage[s] [their] accounts[,]" and that "it's a lengthy process" but Schwab was "working diligently behind the scenes to have the branding changed on your accounts to reflect First Oak Wealth Management on all future correspondence." He then provided the new First Oak email addresses for himself, Thomsen, and Davis. (27 Apr. 2017 Email from Airis Abolins Re: DWM & First Oak Wealth Mgmt., ECF No. 50.92; Second Hart Dep. 148:24–149:3.)

92. Thomsen, who was the Chief Compliance Officer of First Oak, testified that, at about this time, he became aware of Davis' troubles in South Carolina. He received the information from the attorneys who were retained to register First Oak as an investment adviser in North Carolina. (Thomsen Dep. 225:20–226:1.)

93. Hart did not submit an opt-out form. (Second Hart Dep. 148:9–16.) He believed, based on these communications, that his account with DWM was being moved in its entirety to First Oak, and that, as Abolins' email indicated, "it was going to be business as usual." (First Hart Dep. 169:5–16; Second Hart Dep. 204:1–12, 211:22–25.) Hart testified that he thought this move was "just rebranding . . . with different ownership" because of Davis' retirement and that Thomsen was "a new Joe Davis." (First Hart Dep. 169:21–170:7.) No one at First Oak told him that anything would change with respect to his account as a result of the "rebranding." (Second Hart Dep. 204:13–19.)

94. It is undisputed that, after his account moved to First Oak, Hart did not invest further in private entities. (Second Hart Dep. 212:18–24.)

95. First Oak published its first brochure on 20 June 2017. The brochure provides that First Oak generally charged an annual client fee of no more than 1.25% of a client's assets under management, payable quarterly and debited directly from the client's account. (First Oak Brochure at First Oak 1191–92, ECF No. 59.33.)

96. The brochure also describes First Oak's Code of Ethics, which required its employees "to act with honesty, good faith and fair dealing in working with clients," prohibited employees from "trading or otherwise acting on insider

information," and mandated that they not take "inappropriate advantage of their positions in relation to First Oak Clients." (First Oak Brochure at First Oak 1195.)

97. The Code of Ethics references policies requiring the monitoring of its employees' personal trading activities to prevent conflicts of interest. It forbids employees from trading in any security within one day prior to a client trade and describes an internal system to report and review employees' personal trading activities. The brochure specifically states that "[i]n the event of any identified potential trading conflicts of interest, First Oak's goal is to place client interests first." (First Oak Brochure at First Oak 1195-96.)

98. Finally, the brochure represents that none of First Oak's registered investment advisors had any legal or disciplinary events to report "that would be material to a client's evaluation of First Oak or the integrity of First Oak's management." (First Oak Brochure at First Oak 1196.)

Additional State and Federal Investigations into First Oak

99. The creation of First Oak did not stop the regulators from scrutinizing Davis and his colleagues. Two months after the signing of First Oak's asset purchase agreement, and a few weeks after Abolins' "business as usual" email, on 31 May 2017, the U.S. Securities and Exchange Commission (SEC) sent a letter to Thomsen informing him of the SEC's intention to conduct a limited scope examination of First Oak with an on-site examination to follow on 5 June 2017. The letter also requested that First Oak give the SEC full access to its client list, documentation of the sale and transfer of DWM's assets to First Oak, an explanation of Davis' affiliation with First

Oak, and any documents about pending, threatened, or settled litigation against First Oak. (Letter from Richards, Staff Accountant, U.S. Sec. & Exch. Comm'n, to Thomsen, Chief Compliance Officer, First Oak Wealth Mgmt., LLC (May 31, 2017), ECF No. 50.29.)

100. On 7 August 2017, the SEC informed Thomsen via email that it had determined that First Oak had breached its fiduciary duty to its clients by listing Davis as a "Senior Board member" on its website, when no such Board existed. The SEC stated that naming Davis a Senior Board member "may [have misled] clients or potential clients about the extent of [First Oak's] business operations." First Oak was directed to take remedial action., (Letter from Donna C. Esau, Assoc. Regional Director, U.S. Sec. & Exch. Comm'n, to Ryan Thomsen, Chief Compliance Officer, First Oak Wealth Mgmt., LLC (Aug. 7, 2017), Ex. A, ECF No. 50.30.)[13] Thomsen responded by letter dated 14 August 2017, informing the SEC that any mention of Davis on First Oak's website was removed as of 18 July 2017. (Thomsen Dep. 187:7-12.)

101. Although he was aware of lawsuits, Abolins claims that he did not know of Davis' consent order with the South Carolina Securities Commissioner until the SEC's subsequent investigation of First Oak in Summer 2017, after the asset purchase deal had closed. (Abolins Dep. 108:3−109:1.)

---

[13] The SEC informed First Oak, "All investment advisers are fiduciaries, regardless of whether they are registered with the Commission, and thus must avoid conflicts of interest with clients and are prohibited from overreaching or taking unfair advantage of a client's trust." (Letter from Donna C. Esau, Assoc. Regional Director, U.S. Sec. & Exch. Comm'n, to Ryan Thomsen, Chief Compliance Officer, First Oak Wealth Mgmt., LLC (Aug. 7, 2017), Ex. A, citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963).)

102.   Thomsen, who was the Chief Compliance Officer of First Oak, testified that he was aware that lawsuits had been filed against DWM and Davis for "[u]nsuitable investments related to private equity." (Thomsen Dep. 38:10−12.)  He became aware of Davis' troubles in South Carolina when attorneys he retained to register First Oak as an investment adviser in North Carolina discovered it. (Thomsen Dep. 225:20−226:1.)  No one at First Oak, including Abolins, informed Hart. (Abolins Dep. 107:15−21, 113:2−13.)  Hart admits that he never checked to see if Davis was on the First Oak Board, and he testified that he was not aware of the regulatory agency investigations.  (First Hart Dep. 69:12−71:21; 183:20−184:2.)

103.   After the SEC completed its investigation, First Oak and Davis mutually agreed to terminate Davis' consulting agreement with First Oak. (12 October 2017 First Oak Termination of Consulting Agreement with Joseph P. Davis, ECF No. 50.34.)  Because the regulators told First Oak that it could not compensate Davis with a percentage of its revenue, the APA was amended, and he was issued a promissory note instead.  (Amendment to Asset Purchase Agreement, ECF No. 48.13; Abolins Dep. 224:23−225:8.)

104.   Thereafter,  on 17 July 2018, the SEC issued a consent order based on its agreement with Davis.  The SEC barred Davis from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization in any jurisdiction. (SEC Consent Order, ECF No. 59.25.)

<u>First Oak's Reassurances to Hart</u>

105.    Even as the investigations were taking place, Davis, Thomsen, and Abolins continued to reassure Hart that everything was copacetic.  On 3 April 2017, after receiving an out-of-office email from Davis, Hart emailed Abolins asking for the status of his private investments for tax purposes.  Abolins replied via email using the First Oak logo:

> The latest from Joe is that we expect no taxable reportable events from ADA, IQmax [sic] or SleepSafeDrivers [sic].  Montague K-1s are finalized . . . accountants are breaking them up for individual distribution . . . no profit . . . manager actually harvested some unrealized losses as he switched positions.  That's all I have at this point.

(April 2018 Email Exchange between Abolins and Hart [17 Apr. 2018 Email Exchange], ECF No. 48.17.)

106.    Hart testified that Abolins' use of the logo caused him to believe that his private investments were being managed by First Oak, (Second Hart Dep. 153:12−17, 206:16−24), even though the only report he received from First Oak did not mention his private holdings.  (First Oak Client Return Summary, ECF No. 48.16.)  Hart testified that he did not ask why his private investments did not appear on the October 2017 Client Return Summary.  (Second Hart Dep. 152:17−25.)  At the time, Hart surmised that his private holdings were not on the report because his investments were still transferring over from DWM.  (Second Hart Dep. 153:1−11.)

107.    In addition, in October 2017, after the SEC Consent Order, Davis and Thomsen met Hart for an in-person lunch at a restaurant in Charlotte.  (Second Hart Dep. 149:15−20.)  According to Thomsen, the purpose of the meeting was for Davis to

introduce Thomsen and to tell Hart that Davis was leaving First Oak. (Thomsen Dep. 90:9–18.) Thomsen recalls reviewing Hart's financial plan, which he stated, "felt like a pretty normal review," (Thomsen Dep. 100:20–25), except that he learned for the first time that Hart had investments in private placements. Even so, Thomsen said nothing to clarify (a) that First Oak was not managing the private investments and (b) that the SEC had prohibited Davis from acting as an investment advisor. (Thomsen Dep. 97:24–98:5.) This meeting was the only time Thomsen met in-person with Hart. (Thomsen Dep. 219:12–18.)

108. Hart testified that Thomsen did not say much at their lunch meeting aside from pleasantries and telling Hart that he would be Hart's main contact at First Oak and Abolins would continue sending quarterly reports. (Second Hart Dep. 151:15–25.) Hart testified that he asked for a status update on ADA Capital, IQMax, SleepSafe, and Integro, and Davis told him that everything was "going great." (Second Hart Dep. 150:17–24.) Davis never mentioned his cancer diagnosis. (Second Hart Dep. 150:10–12.)

109. In December 2017, weeks after the lunch meeting, Thomsen, worried that there was some ambiguity regarding Davis' involvement at First Oak, followed up with Hart via email to schedule another meeting. (Thomsen Dep. 89:13–90:3, 91:2–5.) However, the second meeting never took place. (Thomsen Dep. 219:12–18.) Instead, Hart decided to move his account. (Second Hart Dep. 154: 15–17.)

<u>Hart Transfers Funds From First Oak</u>

110.   On 15 December 2017, Hart sent an email to Abolins and Thomsen stating that he would be transferring his funds from First Oak within the week and asking for a final invoice of outstanding fees owed.   Three days later, Thomsen replied, telling Hart to disregard any outstanding invoices. (15 December 2017 Email at Hart 1073, ECF No. 48.6.)

111.   Hart explained that he moved his publicly traded investments but did not know how to move his private investments.  (Second Hart Dep. 154:19–24.)  He expected First Oak to give him instructions on his private investments, but "there was no discussion whatsoever."   (Second Hart Dep. 155:5–9; 156:22–157:10.) However, when asked during his deposition if he was "still going to be looking to First Oak after December 15, 2017 to advise [him] whether or not those private investments continued to fit [his] investment goals?"  Hart responded, "I don't know. I hadn't really thought about it."  (Second Hart Dep. 156:7–11.)  According to his expert, Hart's private investments were likely worth nothing by then.   (Reagan Dep. 90:1–11.)

112.   On 9 April 2018, while preparing to file his taxes, Hart emailed Abolins and First Oak for information on his investments in ADA Capital, Montague, SleepSafe, and IQMax.  Within the hour, Abolins replied to Hart:

> First Oak does not manage private equity.   Those interests were retained by DWM and Joe Davis.  I am copying Joe Davis on this reply so that he can provide answers to your questions.

(17 Apr. 2018 Email Exchange.)

113. Hart responded to Abolins, telling him that his reply was not "consistent with the email that was sent last year that said the conversion from DWM to First Oak was complete and 'it was business as usual' (see attached) or the response to last year's [April 2017] email from [Abolins] regarding the 2016 K-1s (below)." He requested a written explanation of "the relationship between DWM and First Oak and the status of, documentation for, and contact information for any private equities that [Hart] invested in." (17 Apr. 2018 Email Exchange.) There is no response in the record from Abolins, Davis, or anyone else at First Oak to Hart's email.

114. Contrary to Abolins' email, Hart testified that he was not aware that DWM was "an ongoing concern" in 2018. He thought "all parts of DWM were being transitioned over to First Oak, and it was business as usual[.]" Nobody told him that his private investments did not transfer. (Second Hart Dep. 158:10−23.)

115. Thereafter, from April 2018 to January 2019, Hart testified that he did not receive any information from Defendants about his private investments, although he occasionally received communications directly from SleepSafe and IQMax. (First Hart Dep. 170:21−171:9; Second Hart Dep. 159:15−18; 182:4−14.) He also testified that he did nothing to follow up. Hart explained that at the time, his attention was consumed by his business partner's decision to retire. (Second Hart Dep. 181:15−25.) Even so, when asked whether he would have started looking for an attorney to pursue First Oak had the ownership transition at his firm not been occurring, Hart doubted that he would have. (Second Hart Dep. 182:1−4.) He testified, "I got kids in college

and/or high school. So between the personal issues and other things, it was just a busy time." (Second Hart Dep. 182:17−19.)

116. In early January 2019, perhaps prompted by the "start of tax season" he "had a trigger somewhere that [he] needed to follow up on these [private] investments if the folks at First Oak were disavowing any relationship with them despite what [he] had been told otherwise." This "trigger" led Hart to reach out to Davis on 8 January 2019 via email, asking for an update on his investments in IQMax, Integro, and ADA Capital. (First Hart Dep. 166:19−23, 167:5−8.)

117. Within hours after Hart sent that email, Davis replied asking if Hart could speak with him by telephone. (8 Jan. 2019 Email, ECF No. 48.18.) Hart recalls that he did talk to Davis over the phone and that they discussed his private investments but did not talk about First Oak. (First Hart Dep. 168:18−22.)

118. Subsequently, in April 2019, the North Carolina Secretary of State, as the Administrator of the North Carolina Investment Advisers Act, sanctioned First Oak for employing Davis and representing him as a "Senior Board member" on its website. In addition, because Davis previously had been barred from the South Carolina securities industry and therefore was not eligible to register as an investment adviser representative in North Carolina, the Secretary of State concluded that First Oak's employment of Davis and its use of him as an unregistered investment adviser representative was an unethical business practice prohibited by the North Carolina Investment Advisers Act, N.C.G.S. § 78C-1, *et seq.* (*In re: First*

*Oak Wealth Mgmt., LLC*, 17 SEC 081 (N.C. Sec'y State, Apr. 8, 2019) [NC Consent Order], ECF No. 59.27.)

119. Specifically, the North Carolina Secretary of State found the following facts:

a. DWM terminated its status as a registered investment adviser with the U.S. Securities and Exchange Commission on May 17, 2017. Also, Davis terminated his status as an investment adviser representative with DWM on May 1, 2017.

b. After [First Oak] registered as an investment adviser firm in North Carolina on May 3, 2017, [First Oak] solicited clients with publically (sic) traded securities accounts who had been investment advisory clients of DWM to become investment advisory clients of [First Oak.]

c. The solicitation by [First Oak] consisted of general messaging to DWM clients to have them agree to the transfer of their investment advisory accounts over to [First Oak] and that "it was business as usual" and the only thing changing was the "back office and compliance support."

d. Davis was identified by e-mail and other correspondence as part of the "First Oak Team" and advised [First Oak] regarding what advice should be given to a particular client (based on suitability) who had inquired about a particular security. [First Oak] had Davis meet personally with certain DWM clients to recommend the services of the newly created [First Oak].

e. As a consequence of [the above paragraphs], Davis solicited or offered or negotiated for the sale of investment advisory services for [First Oak].

\* \* \* \*

f. Although the South Carolina Securities Commissioner ordered that Davis was "permanently barred from participating in any aspect of the securities industry in or from the State of South Carolina," [First Oak] did not convey this information in writing (prior to or at the time of the solicitation) to any of those solicited DWM clients or to any of [First Oak's] prospective investment advisory clients that were referred by Davis.

(NC Consent Order 3–4.)

120. Among other determinations, the North Carolina Secretary of State concluded as a matter of law:

    a. [First Oak]'s utilization of Davis as an unregistered investment advisor representative [was] an unethical business practice in the securities or financial services industry pursuant to N.C.G.S. § 78C-19(a)(2)(g) and 18 NCAC 06A.1801(a)(18).

    b. [First Oak] failed to reasonably supervise Davis when he acted as an investment advisor representative of [First Oak], in violation of N.C.G.S. § 78C-19(a)(2)(j) and 18 NCAC 06A.1808.

    c. [First Oak] failed to comply with 18 NCAC 06A.1707(b), as authorized by N.C.G.S. § 78C-18(b), when it did not provide written information about Davis to its prospective investment advisory clients who were solicited by Davis.

(NC Consent Order 5-6.)

121. First Oak, while neither agreeing with nor denying the findings and conclusions of the agency, consented to the terms of the order. It agreed to comply with the North Carolina Investment Advisers Act, to pay a civil monetary penalty of $25,000, and to reimburse the State of North Carolina another $55,000 for the cost of the investigation. In addition, First Oak was ordered to provide a copy of the consent order to all clients who were formerly DWM clients or were referred by Davis to First Oak. (NC Consent Order 7–9.) It appears that no one told Hart. (Hart Dep. 68:18–70:3.)

122. It was not until the COVID-19 pandemic began in 2020 and Hart's business began to slow down that he began to focus on his private investments. (Second Hart Dep. 170:1–6.) After doing some internet research on his own, Hart discovered that Davis had been barred by the SEC, that complaints had been filed

against Abolins, and that there were some settlements involving Abolins. (Second Hart Dep. 184:6−17; 186:8−15.) Hart testified that he had no prior knowledge of Davis' and Abolins' regulatory issues. (Second Hart Dep. 184:17−21.) He retained counsel and this lawsuit was filed on 1 October 2021. (Second Hart Dep. 184:22−185:16.)

## II.    PROCEDURAL HISTORY

123. In his Complaint, filed 1 October 2021, Hart asserted claims for constructive fraud, common law fraud, violation of the North Carolina Investment Advisers Act, N.C.G.S. § 78C-38 *et seq.*, (NCIAA violations), negligent misrepresentation, violation of the North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C.G.S. § 75D-1 *et seq.*, (RICO violations), and civil conspiracy against First Oak, Abolins, and Davis. Hart demanded both compensatory and punitive damages. (*See generally* Compl., ECF No. 3.)

124. Both First Oak and Abolins initially moved to dismiss the Complaint. (Def. Airis Abolins' Mot. Dismiss, ECF No. 9; Def. First Oak Wealth Mgmt., LLC's Mot. Dismiss, ECF No. 14.)[14] After briefing and a hearing on the issues, the Court granted in part and denied in part both motions to dismiss. *Hart v. First Oak Wealth Mgmt., LLC*, 2022 NCBC LEXIS 81, at **67 (N.C. Super. Ct. July 28, 2022). Specifically, the Court dismissed Hart's RICO claims against Abolins and First Oak, as well as Hart's claims for affirmative fraud and negligent misrepresentation

---

[14] DWM and Davis have yet to answer the complaint and have not yet appeared in this case. *See Hart v. First Oak Wealth Mgmt., LLC*, 2022 NCBC LEXIS 81, at **25 (N.C. Super. Ct. July 28, 2022).

against Abolins. *Id*. All other claims, including Hart's claims for fraudulent concealment against both First Oak and Abolins, remain.

125. Discovery is now complete, and before the Court are First Oak's and Abolins' (the Moving Defendants) motions for summary judgment on the remaining claims. (First Oak Mot.; Abolins Mot.) After full briefing and a hearing, (Not. H'rg, ECF No. 70), the Motions are ripe for resolution.

## III.    LEGAL STANDARD

126. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c); *see also Watts v. Cumberland Cnty Hosp. Sys., Inc.*, 317 N.C. 110, 115 (1986) ("Summary judgment is appropriate (1) when a claim or defense is utterly baseless in fact, or (2) when the facts are indisputable but there is controversy as to a question of law.").

127. Genuine issues of material fact are those "which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation and internal quotation marks omitted).

128. In reviewing a motion for summary judgment, the Court must consider all evidence in the light most favorable to the non-moving party. *Belmont Ass'n v.*

*Farwig*, 381 N.C. 306, 310 (2022) (citing *Dalton v. Camp*, 353 N.C. 647, 651 (2001)). The movant has the burden of establishing the lack of any triable issue of fact. *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

129. The movant can satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim." *Dobson v. Harris,* 352 N.C. 77, 83 (2000) (citations omitted). Should the moving parties satisfy their burden, then the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Lowe v. Bradford,* 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)). If the nonmoving party fails to satisfy his burden, then "summary judgment, if appropriate, shall be entered against" the nonmovant. N.C. R. Civ. P. 56(e).

130. Ultimately, when ruling on a motion for summary judgment, a trial court will not resolve issues of fact "and must deny the motion if there is any genuine issue of material fact." *Singleton v. Stewart,* 280 N.C. 460, 464 (1972).

### IV. ANALYSIS

#### A. Statute of Limitations

131. The Court first turns to the Moving Defendants' assertions that the statute of limitations has expired on Hart's claims against them.

132. Defendants contend that the statute of limitations started a decade ago, when Hart was provided offering materials describing the highly speculative nature

of one of his private investments. (Mem. Supp. Def. Airis Alexander Abolins' Mot. Summ J. [Abolins Br.] 35–37, ECF No. 52; Reply Mem. Further Supp. Def. Airis Alexander Abolins' Mot. Summ. J. [Abolins Reply] 2–5, ECF No. 69.) They argue that certainly by 2015, when CarFab collapsed, Hart, an accredited investor informed of the highly speculative nature of his investments, should have been alerted to investigate. Even if Hart was not alerted then, Abolins argues that when Hart was told in April 2018 that First Oak was not managing the private equity part of his portfolio, Hart should have known something was amiss. Therefore, Defendants contend that, at the latest, the statutes of limitation for fraud, negligent misrepresentation, and violation of the NCIAA were triggered and had run by April 2021, months before Hart filed this lawsuit. (Def. First Oak Wealth Mgmt., LLC's Mem. Law Supp. Mot. Summ. J. [First Oak Br.] 26–27, 30–31, 33–34, ECF No. 49; Abolins Br. 35-37.)

133. Hart responds that Davis, Abolins, and later First Oak, through its reports, emails, and the October 2017 lunch meeting, concealed the actual state of his private holdings such that he could not have discovered the alleged wrongs until he decided to check the FINRA website in 2021 and saw negative information about Davis. He testified that he decided to check the website because he "thought it was a little strange" that none of the private investments "worked out" the way they had been presented to him. Whether he should have been prompted to check Davis' background sooner, he argues, is for a jury to determine rather than the Court at the

summary judgment stage. (Pl.'s Br. Opp. Def. First Oak Wealth Mgmt.'s Mot. Summ. J. [Pl. Br.] 29–30, ECF No. 58.)

134. "When a defendant pleads the statute of limitations in bar of a plaintiff's claim, the burden is upon the plaintiff to show that its suit was commenced within the appropriate time from the accrual of the cause of action." *Chase Dev. Grp. v. Fisher, Clinard & Cornwell, PLLC,* 211 N.C. App. 295, 304 (2011) (citing *Pembee Mfg. Corp.,* 313 N.C. at 491). In this case, that burden falls on Hart. Abolins contends that the undisputed facts establish that Hart has failed to meet his burden.

135. The statute of limitations for both negligent misrepresentation and fraud is three years. *See* N.C.G.S. § 1-52(5) (negligent misrepresentation); § 1-52(9) (fraud). NCIAA violations are also subject to a three-year statute of limitations. *See* N.C.G.S. § 78C-38(d).

136. A claim accrues under the applicable statute of limitations when "the right to institute and maintain a suit arises." *Thurston Motor v. Gen. Motors*, 258 N.C. 323, 325 (1962). Typically, this right arises at the time the injury occurs "even in ever so small a degree." *Matthieu v. Gas Co.*, 269 N.C. 212, 215 (1967).

137. However, in certain instances, the "discovery rule" applies. The discovery rule is an objective standard that "tolls the statute of limitations only until a reasonable person should have discovered the fraud under the circumstances and in the exercise of reasonable prudence. The particular moment that a specific plaintiff alleges he *actually* discovered the fraud is irrelevant." *Taylor v. Bank of*

*Am., N.A.*, 385 N.C. 783, 789 (2024) (citing *Latham v. Latham*, 184 N.C. 55, 66 (1922)).

138. When the discovery rule applies, the statute of limitations does not begin to run until the plaintiff reasonably knows or should have known of facts that amount to a claim. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 2 (2017) ("North Carolina law has long recognized the principle that a party must timely bring an action upon discovery of an injury to avoid dismissal of the claim."); *Pembee Mfg. Corp.*, 313 N.C. at 493 ("as soon as the injury becomes apparent to the claimant or should reasonably become apparent, the cause of action is complete and the limitation period begins to run.").

139. Claims for fraud, negligent misrepresentation, and violation of the NCIAA are subject to the discovery rule. *See* N.C.G.S. § 1-52(9) (fraud claims do not accrue "until the discovery by the aggrieved party of the facts constituting the fraud or mistake."); *Jefferson-Pilot Life Ins. Co. v. Spencer*, 336 N.C. 49, 57 (1994) (a claim for negligent misrepresentation "does not accrue until two events occur: first, the claimant suffers harm because of the misrepresentation, and second, the claimant discovers the misrepresentation."); N.C.G.S. § 78C-38(d) (if a defendant "engages in any fraudulent or deceitful act that conceals the violation or induces the person to forgo or postpone commencing an action based upon the violation, the suit may be commenced not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful").

140. With respect to a claim for fraud, our appellate courts have defined "discovery" within section 1-52(9) as "actual discovery or the time when the fraud should have been discovered in the exercise of due diligence." *Spears v. Moore*, 145 N.C. App. 706, 708 (2001). Accrual begins "at the time of discovery regardless of the length of time between the fraudulent act or mistake and plaintiff's discovery of it." *Forbis v. Neal*, 361 N.C. 519, 524 (2007) (quoting *Feibus & Co. v. Godley Constr. Co.*, 301 N.C. 294, 304 (1980)).

141. Absent undisputed circumstances that, as a matter of law, would have alerted a reasonable person to investigate, determining when a plaintiff discovered or should have discovered facts constituting a claim is generally an issue of fact reserved for a jury. *See Forbis*, 361 N.C. at 524 ("Ordinarily a jury must decide when fraud should have been discovered in the exercise of reasonable diligence under the circumstances. This is particularly true when the evidence is inconclusive or conflicting."); *Feibus*, 301 N.C. at 304–05 ("When [a] plaintiff should, in the exercise of reasonable care and due diligence have discovered the fraud is a question of fact to be resolved by the jury."); *Piles v. Allstate Ins. Co.*, 187 N.C. App. 399, 405 (2007) ("The date of [Plaintiff's] discovery of the alleged fraud or negligence – or whether she should have discovered it earlier through reasonable diligence – is a question of fact for a jury[.]").

142. On the other hand, a plaintiff who ignores warning signs and fails to exercise reasonable diligence does so at his peril. When the undisputed facts *do* demonstrate that a reasonable person would have been on notice of the need to

investigate, this issue may be resolved as a matter of law. *See, e.g., Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 585 (2003) (affirming trial court's dismissal of fraud claim on summary judgment where evidence established that plaintiff failed to exercise due diligence in uncovering the alleged fraud); *Spears v. Moore*, 145 N.C. App. 706, 708-09 (2001) ("Failure to exercise due diligence may be determined as a matter of law. . . where it is clear that there was both *capacity* and *opportunity* to discover the [fraud]"); *Jennings v. Lindsey*, 69 N.C. App. 710, 715 (1984) ("Where a person is aware of facts and circumstances which, in the exercise of due care, would enable him or her to learn of or discover the fraud, the fraud is discovered for the purposes of the statute of limitations.").

143. In this case, obvious red flags appeared even before First Oak was formed. For example, the offering memoranda DWM provided to Hart identified the private investments as both high risk and speculative. Some of them spelled out Davis' conflicts of interest. The WCRs Hart received from DWM contained disclaimers and definitions regarding value that are inconsistent with a conclusion that they were accurate reports of the fair market value of Hart's private investments. Hart was sufficiently dissatisfied with these private investments that he instructed DWM in May 2014 not to invest any more of his funds this way. Hart knew that the CarFab investment was worthless by 2015. Lawsuits against Davis, Abolins, and DWM were appearing in the public record. The South Carolina Commissioner's order barring Davis from the investment advisory industry in South Carolina was public as of 2 May 2016. Still, Hart largely accepted information he

was given at face value and did not ask probing questions or seek to investigate any of his investments beyond attending one shareholders' meeting in 2013 and checking to make sure the companies in which he invested had websites on the internet.

144. When First Oak appeared in 2017, Hart received only one report showing the value of his investments, and it listed only the publicly traded ones. Shortly after he was informed of Davis' "retirement" during the lunch meeting in October 2017, Hart closed his account with First Oak in December 2017. Hart testified that he moved his publicly traded investments but did not know how to transfer his private investments, so he just left them hanging until April 2018, when he asked for information to prepare his taxes. At that time Abolins expressly told Hart in an email that First Oak had never managed the private investments, which surprised Hart, yet Hart still did nothing to investigate until he emailed Davis on 8 January 2019. He apparently accepted Davis' word on the state of his investments, because Hart did nothing further to investigate until sometime in 2020, during the COVID shutdown, when he says he finally had the time to look into the matter.

145. Hart maintains that there was good reason for his inaction. He paid a fee to be able to rely on registered investment advisors to watch his investments for him. But while use of a fiduciary might explain Hart's conduct when it comes to constructive fraud, it does not relieve him of his legal obligations with respect to fraud in general. By April 2018 at the latest, a reasonable person would have been on notice that the private investments at issue were inconsistent with a conservative investment profile and riddled with conflicts of interest. A reasonable person would

have taken more care to determine the whereabouts of his private investments once told that they were not being managed by First Oak. By 17 July 2018, the SEC's Consent Order barring Davis from acting as an investment advisor was public record. In the face of the undisputed fact, the Court concludes as a matter of law that Hart knew or *should have known* of the alleged fraud with respect to his private investments more than three years before he filed suit.

146. "Statutes of limitations are inflexible and unyielding," commanding "that litigation be initiated within the prescribed time or not at all." *Shearin v. Lloyd*, 246 N.C. 363, 370 (1957). Because Hart did not pursue these three claims in time, the Moving Defendants' Motions with respect to them shall be **GRANTED**.

B. Constructive Fraud

147. On the other hand, Hart's claim for constructive fraud both survives the Motions and has a ten-year statute of limitations. *NationsBank v. Parker*, 140 N.C. App. 106, 113 (2000) ("A claim of constructive fraud based upon a breach of a fiduciary duty falls under the ten-year statute of limitations contained in N.C.G.S. § 1-56[.]").

148. Constructive fraud is a claim that "originated in courts of equity and is based on the notion 'not that there is fraud, but that there may be fraud' where a fiduciary has consummated a transaction benefiting himself and harming those to whom he owes a fiduciary duty." *Provectus Biopharmaceuticals, Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at *58-59 (N.C. Super Ct. Sept. 28, 2018) (quoting *Lee v. Pearce*, 68 N.C. 76, 81 (1873)).

149. To raise the presumption of constructive fraud "a plaintiff must establish (1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction." *Sullivan v. Mebane Packaging Grp., Inc.,* 158 N.C. App. 19, 32 (2003).

150. Once the presumption arises, the accused fiduciary can rebut it by showing that he did not abuse the plaintiff's trust. If successfully rebutted, the presumption "evaporates, and the accusing party must shoulder the burden of producing actual evidence of fraud." *Chisum v. Campagna,* 376 N.C. 680, 709 (2021) (quoting *Watts,* 317 N.C. at 116).

151. Constructive fraud differs from actual fraud in that "it is based on a confidential relationship rather than a specific misrepresentation." *Terry v. Terry,* 302 N.C. 77, 85 (1981). "When . . . the superior party obtains a possible benefit through the alleged abuse of the confidential or fiduciary relationship, the aggrieved party is entitled to a presumption that constructive fraud occurred." *Forbis,* 361 N.C. at 529. The presumption arises "not so much because the fiduciary has committed a fraud, but because he may have done so[.]" *Id.* (cleaned up).

152. As discussed above, ordinarily a plaintiff must exercise reasonable diligence to discover the facts constituting a claim. When a fiduciary commits the injury, however, the plaintiff is entitled to rely on the fiduciary's duty to disclose the truth when deciding whether to conduct his own inquiry. *Forbis,* 361 N.C. at 525

("When . . . the fraud is allegedly committed by the superior party to a confidential or fiduciary relationship, the aggrieved party's lack of reasonable diligence may be excused."). Thus, a plaintiff's failure to use due diligence to discover an allegedly fraudulent act may be excused if he is "actually deterred" from "suspecting or discovering the fraud." *Wilson v. Pershing, LLC*, 253 N.C. App. 643, 655 (2017) (quoting *Vail v. Vail*, 233 N.C. 109, 116 (1951)).

153. Nevertheless, a plaintiff cannot ignore tell-tale signs that something is amiss, even when a fiduciary is involved. "This principle of leniency does not apply . . . when an event occurs to excite [the aggrieved party's] suspicion or put [him] on such inquiry as should have led, in the exercise of due diligence, to a discovery of the fraud." *Forbis,* 361 N.C. at 525; s*ee also Vail v. Vail*, 233 N.C. 109, 116−17 (1951) ("it is generally held that when it appears by reason of the confidence reposed the confiding party is actually deterred from sooner suspecting or discovering the fraud, he is under no duty to make inquiry *until something occurs to excite his suspicions*." (emphasis added) (cleaned up)); *Small v. Dorsett*, 223 N.C. 754, 761 (1944) ("Where a confidential relationship exists between the parties, failure to discover the facts constituting fraud may be excused. In such a case, *so long as the relationship continues unrepudiated*, there is nothing to put the injured party on inquiry, and he cannot be said to have failed to use due diligence in detecting the fraud." (citation omitted) (emphasis added)).

154. In this case there is evidence upon which a jury could conclude that Hart's fiduciaries deterred him from suspecting or discovering the alleged fraud.

Consequently, when the statute of limitations began to run on Plaintiff's claim for constructive fraud is a jury question.

        (i)     <u>Abolins</u>

155.   As a registered investment adviser representative working on Hart's account, the Court previously concluded that Abolins was Hart's fiduciary as a matter of law. *Hart*, 2022 NCBC LEXIS 81, at **30–31 (citing 18 N.C. Admin. Code 06A.1801(a)); *see also SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 201 (1963) (holding that investment advisers registered under federal law are fiduciaries); *Burton v. Hobart Fin. Grp., Inc.,* 2024 NCBC LEXIS 34, at **68 (N.C. Super. Ct. Feb. 26, 2024).

156.   There is also evidence to support a *de facto* fiduciary relationship. Hart's agreement with DWM gave it "full power to direct, manage, and change the investment and reinvestment of the assets" in his account "and to take other action with respect to such assets, all without prior consultation with or notice to [him.]" (DMW Inv. Adv. Agreement.) DWM's brochure to clients specifies that "[u]nder the Investment Advisers Act of 1940, DWM owes fiduciary duties to its clients." (DWM Brochure 7.)

157.   While at DWM, Abolins acted as Chief Investment Officer, promising to focus "at the client level . . . making sure no stone is left unturned" – a promise that is contrary to his current contention that his role was merely to convey information he received from Davis. Hart testified that Abolins reviewed his investment performance with him and provided tax information. Consistent with his

understanding of DWM and Abolins' role, Hart signed forms (some pre-populated) agreeing that he was an accredited investor because his fiduciaries, including Abolins, told him to. Whether Abolins (a) knew the investments were overvalued and conspired with Davis to defraud Hart; (b) simply turned a blind eye to the numbers he was being given so that he could accept the benefit of higher fees when he received his share of the firm's profits; or (c) acted only as a scrivener for Davis is an issue for the jury to decide.

158. Even so, Abolins contends that he cannot be liable to Hart for constructive fraud because there is no evidence that he enriched himself at Hart's expense. Abolins argues that payment for work Abolins actually performed is not an improper benefit that gives rise to constructive fraud. (Abolins Br. 27−28.)

159. "The fact that the defendant obtained a benefit is . . . the defining feature of constructive fraud and what sets such a claim apart from a claim for breach of fiduciary duty." *Provectus Biopharmaceuticals, Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at *58−59 (citing *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294 (2004)); *see Ironman Med. Props., LLC v. Chodri*, 268 N.C. App. 502, 513 (2019) ("The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the intent and showing that the defendant benefitted from his breach of duty.").

160. Here, Plaintiff has presented sufficient evidence that Abolins improperly benefitted from Hart's misplaced trust to avoid summary judgment on that basis. While at DWM, Abolins produced the reports on which DWM based its

fees.  Those fees were calculated as a percentage of the value of Hart's investment account—an account that included private investments that a jury could reasonably conclude were purposefully overvalued.  As a minority shareholder in DWM, Abolins benefited when DWM benefited.  (DWM Am. Operating Agreement; Abolins Dep. 300:21–25.)  *Burton*, 2024 NCBC LEXIS 34, at \*73–74 (distinguishing *Sterner v. Penn*, 159 N.C. App. 626, 631 (2003), and holding in the Rule 12(b)(6) context that "allegations that the fees and commissions associated with the investment products recommended to Plaintiffs were *excessive and undisclosed*—the benefit Defendants allegedly sought through their breach" were sufficient to state a claim for constructive fraud) (emphasis added)).

(ii)  First Oak

161.  First Oak, while not disputing its fiduciary status, also contends that by successfully soliciting Hart's business, managing Hart's publicly traded assets, and receiving fees for the work it performed, it did not receive the type of benefit necessary to support a claim for constructive fraud.  (First Oak Br. 16-19; First Oak Reply Mem. [First Oak Reply] 15-16, ECF No. 67.)

162.  Our appellate courts have held that "the benefit sought by the defendant must be more than a continued relationship with the plaintiff."  *Sterner*, 159 N.C. App. at 631 (quoting *Barger v. McCoy, Hillard & Parks*, 346 N.C. 650, 667 (1997)).  In addition, "payment of a fee to a defendant for work done by that defendant does not by itself constitute sufficient evidence that the defendant sought his own advantage in the transaction." *NationsBank*, 140 N.C. App. at 114.  Moreover,  this

Court has determined that a plaintiff's contention that the defendants committed fraud to protect their own reputation was not sufficient to show that defendants received a benefit to support a constructive fraud claim. *Deyton v. Estate of Waters*, 2013 NCBC LEXIS 19, at *30-31 (N.C. Super. Ct. Apr. 25, 2013).

163. But this is not a case of a benefit conferred by virtue of a continued relationship. The relationship with First Oak was a new one, and there is evidence that Hart would not have allowed any of his assets to transfer to First Oak in the first place had Abolins, Davis, or Thomsen told him about Davis and DWM's regulatory problems. Instead, there is evidence that First Oak contracted with Davis for his book of business and then put him "out front" to attract former DWM clients, including Hart, in order to establish the newly formed First Oak for owners Thomsen and Abolins. (Thomsen Dep. 21:19–22; 53:2–11.) Therefore, under the particular circumstances presented in this case, the Court concludes that sufficient evidence of an improper benefit exists for Plaintiff's claim to be decided by a jury. *See Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, *73–74 (N.C. Super Ct. Dec. 31, 2019) ("While the benefit sought by the defendant must be more than a continued relationship with the plaintiff, the rationale behind this principle is that presumably, the defendant would have obtained the benefit of a continued relationship with [the plaintiff] equally by providing accurate information." (citing *NationsBank*, 140 N.C. App. at 114)).

164. Finally, both Defendants argue that Plaintiff did not suffer actual damages as a result of their conduct. They point to Hart's admission that he did not

contribute any money to private investments after 2015—well before First Oak was formed in 2017—and to expert testimony presented by Hart that it was likely that many of Hart's investment losses had already occurred by the time his account transferred to First Oak. To the extent Hart suffered losses after the transfer, the Moving Defendants argue that the evidence of those losses is too speculative to submit to the jury. (Abolins Br. 31−32; 37; First Oak Br. 2, 19−20, 23.)

165. The Moving Defendants' arguments regarding damages are easily dispatched. While they might bear on a claim for common law fraud, *Collier v. Bryant*, 216 N.C. App. 419, 430–31 (2011) (quoting *Hawkins v. Hawkins*, 101 N.C. App. 529, 532–33 (1991)), they are not dispositive of a claim for constructive fraud. Our appellate courts have concluded that it is "well-established law" that nominal damages are available once a cause of action for constructive fraud has been established. *Chisum*, 376 N.C. at 704−05.

C. Civil Conspiracy

166. Plaintiff's request for damages arising from civil conspiracy is predicated on his underlying allegations of wrongful conduct on the part of Davis and Abolins, individually and as agents for First Oak. Both Abolins and First Oak argue that they cannot be found liable on a civil conspiracy theory because Hart has not presented evidence of an agreement between First Oak, Abolins, and Davis to commit any unlawful acts resulting in injury to Hart. (Abolins Br. 37; First Oak Br. 13−16.)

167. Hart responds that circumstantial evidence supports a conclusion that Abolins, First Oak, and Davis agreed to create First Oak, among other reasons, to

hide Davis' disbarment from the securities industry by state and federal authorities. Plaintiff contends that they then contracted with Davis and sent misleading communications to attract Plaintiff and others to First Oak as clients. (Pl. Br. 31–32; First Hart Dep. 174:11–175:4.)

168. Civil conspiracy is not an independent claim. *Dove v. Harvey*, 168 N.C. App. 687, 690 (2005). Rather, "[a] civil action for conspiracy is an action for damages resulting from acts committed by one or more of the conspirators pursuant to the formed conspiracy, rather than the conspiracy itself." *Krawiec v. Manly*, 370 N.C. 602, 613 (2018) (quoting *Burton v. Dixon*, 259 N.C. 473, 476 (1963)). It "associate[s] the defendants together and perhaps liberalize[s] the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all." *Fox v. Wilson*, 85 N.C. App. 292, 301 (1987). Pleading civil conspiracy allows a plaintiff to recover from anyone who facilitated the alleged wrongs "by agreeing for [the wrongs] to be accomplished." *Nye v. Oates*, 96 N.C. App. 343, 346–47 (1989).

169. Civil conspiracy requires evidence of "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to [the] plaintiff inflicted by one or more conspirators; and (4) pursuant to a common scheme." *Privette v. Univ. of N.C. at Chapel Hill*, 96 N.C. App. 124, 139 (1989). A conspiracy may be established by circumstantial evidence, but evidence of the agreement "must be sufficient to create more than a suspicion or conjecture in order to justify submission to a jury." *Henderson v.*

*LeBauer*, 101 N.C. App. 255, 261 (1991); s*ee also Kixsports, LLC v. Munn*, 2021 NCBC LEXIS 32, at *37 (N.C. Super. Ct. Apr 1, 2021) ("An action for conspiracy may be proven through circumstantial evidence, and behavior that may be benign or innocuous when standing alone can acquire a different meaning when placed in a larger context" (citation and quotation marks omitted)).

170.    Moreover, as this Court previously held, a conspiracy claim cannot be maintained "for acts that occurred before [a party] joined the alleged conspiracy *if those acts completed the ultimate objective* of the conspiracy.  In contrast, if the objective of the conspiracy was not yet achieved when [the party] joined, then [the party] remains jointly and severally liable for those acts."    *Hart*, 2022 NCBC LEXIS 81, at **66 (citing *In re Am. Cont'l Corp. v. Lincoln Savs. & Loan Sesc. Litig.*, 794 F. Supp. 1424, 1437 (D. Ariz. 1992)).

171.    Here, there is sufficient circumstantial evidence of an agreement among Davis, Abolins, and First Oak to commit constructive fraud to allow Plaintiff's conspiracy theory to survive the Moving Defendants' Motions.  Abolins set out to find a buyer for DWM's assets in 2016, after several of DWM's clients had filed lawsuits alleging securities fraud, and while DWM and Davis were being actively investigated by the South Carolina Securities Commissioner.  Just three weeks after Davis sent a letter to Hart telling him that DWM had decided to partner with Thomsen to form First Oak, Davis and DWM entered into a consent order with the South Carolina Securities Commission forbidding them from engaging in the securities industry in that state.  Plaintiff has presented evidence that no one told him about the lawsuits

or the consent order. Instead, they led him to believe nothing had changed and that the move to First Oak was simply a "rebranding."

172. Further, Hart testified that he was not told that his private investments did not transfer to First Oak until April 2018, after he had closed his account there. He testified that Thomsen and Abolins, owners of First Oak, led him to believe that Davis continued to be a credentialed adviser who would manage all of his DWM investments at First Oak. Both Davis and Abolins used language in their communications with Hart to suggest that there would be no change in his dealings with them, and early in Hart's relationship with First Oak, Abolins responded to Hart's tax questions regarding his private investments in an email using the First Oak logo. At the October 2017 lunch meeting, Davis again reassured Hart that his private investments were being managed, and Thomsen did nothing to stop Hart from concluding that Davis was speaking as First Oak's agent.

173. Based on the evidence presented, a jury could reasonably conclude that Defendants agreed among themselves to keep material information from Hart. "So long as [Hart] can show an agreement among the [Defendants] to carry out the misconduct, 'all of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement.'" *Mecklenburg Cnty. Barings LLC v. Fowler*, 2025 NCBC LEXIS 18, at **19 (N.C. Super. Ct. Feb. 13, 2025) (quoting *Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 53 (2002)).

174. Further, a jury could reasonably find that the ultimate objective of the conspiracy—to unlawfully benefit from Hart's investment account—had not yet been

completed when that account transferred to First Oak. While it appears from the evidence presented that the CarFab / SSE was worthless prior to the transfer, it is unclear whether the same is true for all of the private investments. In addition, First Oak benefitted from taking over management of Hart's publicly traded investments, as discussed above. A reasonable jury could conclude that the ultimate objective of the conspiracy had not been completed when First Oak joined it.

D. Fifth Amendment

175. Davis failed to file an answer or otherwise respond to Plaintiff's Complaint. And, although he appeared for his deposition in this matter, Davis answered every substantive question by invoking the Fifth Amendment. (*See generally* Dep. of Joseph Davis, ECF No. 59.1.) Hart argues that Davis' decision to invoke the Fifth Amendment creates an adverse inference that precludes summary judgment. (Pl. Br. 32.) In addition, Hart contends that Davis' refusal to testify justifies the same adverse inference against Abolins and First Oak, his alleged co-conspirators. (Hart Br. ¶ 16, citing *U.S. v. District Council*, 832 F. Supp. 644, 652 (S.D.N.Y. 1993)).

176. Both Defendants maintain that any negative inference arising from Davis' invocation of the Fifth Amendment is insufficient to preclude summary judgment in their favor because they have not asserted the privilege themselves. (Abolins Br. 22; Abolins Reply 17–20; First Oak Reply 16–18.) However, Defendants argument fails to consider the effect of Plaintiff's allegations of agency, as well as his conspiracy theory.

177. North Carolina law permits factfinders to "infer guilt on a civil defendant who, having the opportunity to refute damaging evidence against h[im], chooses not to" and "to infer that his truthful testimony would have been unfavorable to him." *McKillop v. Onslow Cnty*, 139 N.C. App. 53, 63–64 (2000); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]").  The finder of fact, however, is not *required* to infer guilt from a witness's invocation of the Fifth Amendment.  *See, e.g., Matter of Estate of Trogdon*, 330 N.C. 143, 152 (1991) (affirming a trial court's inference of guilt against witness who invoked the Fifth Amendment but recognizing that "contrary inferences might have been drawn from this same evidence").

178. Here, Davis repeatedly invoked the Fifth Amendment in response to questions at his deposition that pertained to his role at DWM, as well as his role at First Oak.  A reasonable jury could—but is not required to—infer from his refusal to testify that Davis is responsible for constructive fraud, both individually and as an agent for DWM and First Oak.  Given Plaintiff's agency and conspiracy allegations, the impact of this adverse inference with respect to Davis could have implications for the constructive fraud claim against both First Oak and Abolins.

179. In all, because multiple genuine issues of material fact exist with respect to Plaintiff's constructive fraud claim, Moving Defendants' Motions with respect to that claim shall be **DENIED**.

E. Punitive Damages

180. The Complaint also includes a request for punitive damages. (Compl. ¶¶ 285–89.) Because *Chisum* establishes that a successful plaintiff may recover punitive damages on a claim for constructive fraud with or without an award of nominal damages, 376 N.C. at 705, the Moving Defendants' Motions with respect to this relief are **DENIED**.

## V. CONCLUSION

181. **WHEREFORE**, the Court hereby **GRANTS in part and DENIES** in part the Motions, and **ORDERS** as follows:

a) Both Defendant Abolins' Motion for Summary Judgment and Defendant First Oak's Motion for Summary Judgment with respect to Plaintiff's claims for common law fraud, violation of the North Carolina Investment Advisers Act (N.C.G.S. §78C-38), and negligent misrepresentation are **GRANTED**, and those claims are dismissed with prejudice;

b) Both Defendant Abolins' Motion for Summary Judgment and Defendant First Oak's Motion for Summary Judgment with respect to Plaintiff's claims for constructive fraud and conspiracy, as well as Plaintiff's demand for punitive damages, are **DENIED**;

c) The Court shall set a status conference to determine a trial date in this matter after consultation with counsel.

**IT IS SO ORDERED**, this the 14th day of March, 2025.

                                        /s/ Julianna Theall Earp

                                        Julianna Theall Earp
                                        Special Superior Court Judge
                                          for Complex Business Cases